[No. 42045. En Banc. January 20, 1972.]

THE STATE OF WASHINGTON, *on the Relation of Distilled Spirits Institute, Inc., et al., Petitioners,* v. GEORGE KINNEAR *et al., Respondents.*

*Gerald F. Collier,* for petitioners.

*Slade Gorton, Attorney General, Philip H. Austin, Deputy, Timothy R. Malone,* and *Arthur F. Mickey, Assistants,* for respondents.

ROSELLINI, J.—This is a taxpayer's suit[1] to test the constitutionality of Laws of 1971, 1st Ex. Ses., ch. 299, § 9, increasing the amount of excise tax imposed upon the sale of certain intoxicating liquors. A writ of mandamus is sought to restrain the collection of the tax.

The first ground of attack which we will consider is that the act violates article 2, section 19, of the Washington State Constitution, which provides:

No bill shall embrace more than one subject, and that shall be expressed in the title.

The petitioner does not deny that the title, "AN ACT relating to revenue and taxation; . . ." is broad enough to encompass the subject of excise taxes on distilled spirits. Her contention is that section 1 of Substitute Senate Bill No. 897 (Laws of 1971, 1st Ex. Ses., ch. 299), which pertains to tax lien claims against retained percentages in public improvement contracts, and section 2, providing for the transferring of receipts from certain cigarette taxes from the war veterans' compensation bond retirement fund to the general fund, under certain circumstances, are provisions which do not fall within the general subject of revenue.

We need not decide whether there is any merit to these contentions. If an act contains a provision which is not covered by the title, the entire act is not necessarily void. *Swanson v. School Dist. 15,* 109 Wash. 652, 187 P. 386 (1920).

The rule is that, if a portion of a statute is found to be invalid, the entire statute will not be struck down unless

---

[1]Patricia Kelso Nelson purchased a bottle of scotch whisky and paid the tax thereon. She will be referred to as the petitioner.

the invalid portion is unseverable and it cannot be reasonably believed that the legislature would have passed the one without the other, or unless the elimination of the invalid part would render the remainder of the act incapable of accomplishing the legislative purpose. *Boeing Co. v. State,* 74 Wn.2d 82, 442 P.2d 970 (1968); *Hogue v. Port of Seattle,* 54 Wn.2d 799, 341 P.2d 171 (1959).

Neither of those circumstances exists in this instance, and in fact the petitioner does not suggest that the remainder of the revenue act and particularly section 9 is in any manner dependent upon these provisions regarding lien priority and disposition of cigarette tax receipts. Consequently, if it is assumed for purposes of argument that there is any merit to the petitioner's theory that these provisions do not fall within the general subject of revenue, that fact cannot be urged as a ground for striking down the provision increasing the tax on distilled spirits.

The petitioner's remaining contentions consist of two challenges to the procedures of the legislature in enacting Substitute Senate Bill No. 897. One of these is that, because the bill was referred to a "free conference" committee, and was passed as reported by that committee (in accordance with a joint rule of the two houses) without an opportunity for further amendment, there was a violation of Const. art. 2, § 20. The second contention is that the bill was passed by the legislature after midnight on the night of May 10, 1971, some hours after the session expired, under the provisions of Const. art. 2, § 12, and that it is therefore a nullity.

Both of these attacks are directed at the procedures followed by the legislature in enacting the measure. It is urged by the respondent that this court may not inquire into those matters, in view of the restraint which it imposes upon itself under the "enrolled bill" doctrine.[2]

---

[2]This rule, as set forth in our leading case of *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 P. 201 (1893), is that the enrolled bill on file in the office of the Secretary of State, which is duly signed by the presiding officers of both houses (as required by Const. art. 2, § 32, and art. 3, § 17) and otherwise appears fair upon its face, is conclusive

■ We need not consider the applicability of that doctrine, however, since the court does have the power and it is its duty in a case properly presented to it to construe the provisions of the constitution. Where the question is one of great public interest and has been brought to the court's attention in the action where it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to the other branches of the government, the court may exercise its discretion and render a declaratory judgment to resolve a question of constitutional interpretation. *State ex rel. O'Connell v. Dubuque*, 68 Wn.2d 553, 413 P.2d 972 (1966); *Huntamer v. Coe*, 40 Wn.2d 767, 246 P.2d 489 (1952).

From the briefs of the parties to this action, and from our independent research, if indeed the matter is not one of common knowledge, we are compelled to take cognizance of the fact that the members of the legislature, the Governor, the Attorney General, and the people of the state, are all uncertain as to the meaning of Const. art. 2, § 12. We are made aware that each of these desires an interpretation as earnestly as does the petitioner. We are warned of no evil consequences which may follow if the court renders its opinion interpreting the constitutional provision in question.

On the other hand, such an opinion will serve to remove doubts concerning the validity of a number of important legislative acts passed not only in this session but in previous sessions. And since our understanding of the constitution is that it does not in fact restrict the legislature as severely as has been feared, an opinion upon the subject should serve to relieve the legislative body from the necessity of resorting to artifice in order to obtain the time necessary for it to enact the legislation which it finds imperative for the welfare of the state.

It is true that the question does not come before us in the form of a request for a declaratory judgment. However, the

evidence of the regularity of all proceedings necessary for its proper enactment in accordance with the constitutional provisions.

relief sought is in essence the same, and we regard it in the public interest to disregard the form of the action and to render our interpretation.

Before turning to the question involved in the interpretation of Const. art. 2, § 12, we will dispose of the contention that section 20 of article 2 does not permit the procedure followed in the enactment of Substitute Senate Bill No. 897. Section 20 provides:

Any bill may originate in either house of the legislature, and a bill passed by one house may be amended in the other.

■ It is the petitioner's theory that this provision does not countenance the procedure of reconciling differences between the two houses by referring a bill to a free conference committee, whose report, under joint rules, must either be accepted or rejected by both houses without further amendment. Our interpretation of this section is that it does not purport to prescribe the entire course of the enactment of a bill, but merely to assure that the side of the legislature which did not originate a bill may have a chance to amend the same. It is not claimed that the conference committee system interferes with the right of either house to amend a bill when it first reaches that chamber.

The necessity of compromise is inherent in the legislative system, and we cannot conceive that the framers of the constitution intended to forbid the resolution of differences. We are convinced that the provision in question does not forbid the rules which provide for such resolution through use of the free conference committee system.

We come now to the major contention of the petitioner, which is that Const. art. 2, § 12, limits the duration of an extraordinary session of the legislature to 60 calendar days. That section reads as follows:

The first legislature shall meet on the first Wednesday after the first Monday in November, A.D., 1889. The second legislature shall meet on the first Wednesday after the first Monday in January, A.D., 1891, and sessions of the legislature shall be held biennially thereafter, unless

specially convened by the governor, but the times of meeting of subsequent sessions may be changed by the legislature. After the first legislature the sessions shall not be more than sixty days.

The authority of the Governor to call the legislature into extraordinary sessions is provided in Const. art. 3, § 7:

He [the Governor] may, on extraordinary occasions, convene the legislature by proclamation, in which shall be stated the purposes for which the legislature is convened.

Although there is in neither of these provisions any express declaration that the length of time which the legislature may sit when convened specially shall be limited to 60 days, the petitioner declares that it is clear that there is such a limitation. This is so, she says, because the restriction contained in the last sentence of article 2, section 12, is not expressly confined to regular sessions of the legislature.

■ We approach the question presented mindful of the principle that the constitution is not a grant but a restriction upon the legislative power, and that the power of the legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions. *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960).

We have recognized that in order to exercise this power, the legislature must have time for deliberation. In *State ex rel. Robinson v. Fluent,* 30 Wn.2d 194, 191 P.2d 241 (1948), we held that the legislature had inherent power to conduct, by committee, investigations for the purpose of finding facts for the guidance of future legislation, in the interim between sessions, although the power was not expressly granted in the constitution, and regardless of the fact that article 2, section 12, limits sessions of the legislature to 60 days.[3]

---

[3] The house concurrent resolution under consideration there was passed at the regular session of the legislature in 1947, and the question whether Const. art. 2, § 12, applies to extraordinary sessions was not involved.

In *State ex rel. Mullen v. Howell,* 107 Wash. 167, 181 P. 920 (1919), quoted with approval in *State ex rel. Robinson v. Fluent, supra,* this court had held that the absence of an express constitutional grant of the right to act by resolution does not preclude the legislature from acting in that manner, that the power exists unless it is expressly denied by the constitution.

In *State v. Fair,* 35 Wash. 127, 76 P. 731 (1904), this court, only a few years after the adoption of the constitution, held that article 3, section 7, does not restrict the purposes for which legislation may be passed at an extraordinary session, relying upon the rule that the legislative power is absolute unless expressly or by fair implication limited in the constitution. This court refused to find an implied limitation in the requirement that the Governor shall state the purposes for which the legislature is convened. The opinion contains this statement, significant here:

> The legislature was lawfully convened by the governor and, not being limited by the constitution to the consideration of the legislative business for which it was called together, we think it had ample power and authority to enact the general saving statute of June 13, 1901, and it, therefore, follows that that act is constitutional and valid. While the constitution empowers the governor to call extra sessions of the legislature, and defines his duty respecting the same, it does not authorize him to restrict or prohibit legislative action by proclamation or otherwise. [Citations omitted.]

35 Wash. at 133.

This court said:

> All legislative power is declared by the state constitution to be vested in a senate and house of representatives, or, in other words, in "the legislature of the state of Washington." Const., art. 2, § 1. But such powers are not specially defined by the constitution, nor are they, strictly speaking, granted by that instrument.
>
> "The people in framing the constitution committed to the legislature the whole law-making power of the state, which they did not expressly or impliedly withhold.

Plenary power in the legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden." *People v. Draper,* 15 N. Y. 532, 543.

35 Wash. at 132.

Thus it is accepted that the rule that plenary power resides in the legislature, in the absence of express or implied limitation, applies not only to the scope of the laws which it may enact when convened in session but also to its power to do those things necessarily incident to the enactment of laws. In other words, the power is procedural as well as substantive.

Inherent in the power to enact laws is the power to deliberate, and deliberation necessarily requires time. The petitioner appears to take the view that every day that the legislature sits is another day of potential evil. However, this is a view which we do not find shared by any authority cited by the petitioner or by any authority which our independent research has uncovered. On the contrary, it seems to be the universal opinion of students and observers, as well as participants in the legislative procedures, that restrictions upon the length of legislative sessions are unfortunate and unnecessary and are conducive, not to good legislation, but to hastily-drawn and ill-considered legislation. We cite herewith a few examples:

J. Sutherland, in his treatise, 1 Statutes and Statutory Construction § 110 (3d ed. 1943), remarks that it may well be questioned whether any of the rules of procedure included in state constitutions are necessary or desirable limitations on the exercise of the legislative function. It is noteworthy, he says, that these procedural limitations apply only to state legislatures and other governmental institutions exercising legislative functions are not limited by them.[4]

---

[4] Under the Washington Constitution, there are no procedural limitations on the exercise of legislative power by cities, towns and counties.

In 1891, 2 years after our state constitution was adopted, Francis Newton Thorpe, of the School of American History, University of Pennsylvania, writing in the Annals of the American Academy of Political and Social Science, reviewed the constitutions of North Dakota, South Dakota, Montana and Washington, and expressed concern that the framers of these constitutions had unduly restricted their legislatures in the exercise of their legitimate function.[5]

In 1907 a study of American legislatures was made by a professor of political science at the University of Wisconsin, in the American State Series. This author noted the tendency in the latter half of the 19th century to impose restrictions on the length of legislative sessions, and set forth the arguments on the question as follows:

The principal argument of those who favor such restriction of legislative activity is that with less frequent legislative sessions, the more important matters will occupy the attention of the legislators, and individual members will recognize the futility of advancing pet schemes of a merely personal or local interest. But even granting that the quality of legislation could not be improved by this means, at any rate, it is argued, we shall have less of that poor quality to which we have been accustomed. It is hoped that, meeting more rarely, the legislature will attract greater public attention, and thus become a desirable field of activity for men of ability. The work to come before it may be to a certain extent prepared by administrative officers, so that the legislature can immediately enter upon the discussion of specific measures. On the other hand, it is urged in opposition to this view that the attempt to shorten sessions and render them less frequent will necessarily lead to even more hasty legislation than we have had in the past. During the short time available, so many interests will be pressing for a hearing that the legislators will become helplessly confused and will in the end vote on most measures without due investigation. Moreover the continuity of experience which is gained by more frequent sessions, will be lost where the intermission is too long. It may indeed be impossible

[5]F. Thorpe, *Recent Constitution-Making in the United States,* 2 Annals of the American Academy of Political and Social Science 145 (1892).

materially to affect the quality of the legislative product by mere changes in the length and frequency of sessions; and it is certainly conceivable that the annual General Court of Massachusetts may legislate more carefully than would be possible in the rush of a quadrennial session. In general, however, the biennial session commends itself to the judgment of the American people.[1]

[1]When in 1895-6 the question of biennial sessions was discussed in Massachusetts, it caused the greatest political controversy of recent decades in that commonwealth. Although the business interests were strongly in favor of biennial sessions, the old democratic town meeting spirit of Massachusetts asserted itself and maintained the annual session.[6]

Today, there may be proponents of restrictions upon the length of legislative sessions, but it is difficult to find this view expressed in published contemporary critiques. As we have mentioned, the petitioner has cited us to no authority supporting this opinion, and our research has revealed none. It is known that, at the time our constitution was framed, it was common for the people to mistrust their legislatures, but apparently it has not been demonstrated that restricting the length of sessions or other legislative procedures improves lawmaking or prevents undesirable legislation. Among the writers who have come to the view expressed by Sutherland, that such restrictions serve no beneficial purpose, are the following:

W. Keefe & M. Ogul, The American Legislative Process: Congress and the States (1964), at 457:

Given the extraordinary problems now thrust upon the states, sessional limitations appear unwise, even foolish, in the opinion of many commentators.

G. Blair, American Legislatures, Structure and Process (1967), at 151-52:

Opinion in favor of more frequent sessions has developed in a number of states and among reform groups. For instance, the sixth edition of the *Model State Constitution* recommends a provision reading "The legislature

[6]P. Reinsch, American Legislatures and Legislative Methods (1907), at 132-33.

shall be a continuous body during the term for which its members are elected. It shall meet in regular sessions annually as provided by law. It may be convened at other times by the governor or, at the written request of a majority of the members, by the presiding officer of the legislature."

. . .

The futility of state legislatures attempting to cope with the multiplying problems of modern government in biennial sessions of limited days is obvious.

(Footnote omitted.)

M. Jewell and S. Patterson, The Legislative Process in the United States (1966), at 138:

One of the most serious [constitutional] limitations, and one which reflects the greatest distrust of legislatures, is the restriction on the frequency and length of legislative sessions. . . . Such limitations, often quite reasonable when they were adopted, limit severely not only the legislature's opportunities for deliberation but the effec-tiveness of its committees and the ability of less senior members to develop experience and to become ac-quainted with legislative norms. No single factor has a greater effect on the legislative environment than the constitutional restriction on the length of sessions.

(Footnote omitted.)

H. Walker, The Legislative Process, Lawmaking in the United States (1948), at 170:

Limitations on the length of the session are also unwise. What is wanted is the best judgment of the legislators on pending public questions. They should not be forced to give their answers in a fixed time. Constructive legisla-tive labor cannot be forced into a Procrustean bed, as the people of half of the states have recognized by refusing to place constitutional limits on legislative sessions.

This author points out that city councils function very well without limitations upon the length of their sessions and that some of these control budgets larger than those of the states wherein these cities are situated.

J. Fordham, The State Legislative Institution (The Ed-ward G. Donley Memorial Lectures, College of Law, West Virginia University, 1957) (1959), at 50:

It is scant wonder that the last twenty years have seen a great increase in special sessions; they have been necessitated by the normal growth of legislative business, and the special and pressing problems occasioned by depression, war, and various more localized developments.

. . .

In a world of ever-growing complexity, legislative policy-making becomes, of necessity, a continuing responsibility. It cannot be properly discharged if it is to be pursued only in alternate years with a long interval marked by inactivity.

This observation is documented (a) by experience with a large volume of bills introduced early in a biennial session which results in loss of legislative time, pending committee consideration, (b) by the congestion and haste in the closing days of a biennial session, (c) by the frequency of special sessions in recent years, and (d) by the development of the legislative council device.

E. Freund, Standards of American Legislation (1917), at 298:

The present rules of procedure have been devised by the legislative bodies themselves in accordance with their supposed needs; the placing of a number of them in the Constitution has added little to their effectiveness, but has increased the technical grounds of objection to the validity of statutes, and the most elaborately framed safeguards will prove unavailing if not supported by tradition or by a strong legislative conviction of their wisdom and necessity. If an improvement can be effected by procedure, it should be done through the medium of voluntary and flexible house rules.

B. Abernethy, Constitutional Limitations on The Legislature, Governmental Research Series No. 20, Governmental Research Center, University of Kansas (1959), at 10:

Rather than the basis of authority for the state legislature to act in the face of new problems, the state constitution has become the device which too often prevents effective legislative response to the growing and expanding needs and demands of the citizens. The people of the states have denied themselves their strongest instrument for effective state government. . . . A no man's land results in which state political power may not enter. The states themselves have created a power vacuum which they refuse to permit themselves to fill.

But the political world is no more tolerant of a vacuum than is the physical world, and this self-denial on the part of the states has become one of the clear causes of the increase in the power of the central government: an increase which these same states so audibly lament.

*See also American State Legislatures in Mid-Twentieth Century,* Final Report of the Committee on Legislative Processes and Procedures of the National Legislative Conference, The Council of State Governments (April 1961), at 10-11.

At least one writer has observed, however, that the removal of constitutional restrictions would not necessarily result in the problem of too short sessions. As John C. Wahlke, professor of political science at the University of Iowa, in State Legislatures in American Politics, The American Assembly, Columbia University (1966), at 139, has said, the legislators who are actually recruited are men who can afford only a limited amount of time away from their private occupations, and even if the constitutional restrictions were removed, it would not be surprising if the present patterns were to be continued out of force of habit or for the convenience of the legislators themselves.

It is true that these authorities are not judicial writers, but we have been accused in this action of being blind to facts of which all but the courts are aware. We think it only appropriate, therefore, that we not attempt an interpretation of a constitutional provision affecting the legislature without first informing ourselves, as best we can, of the probable impact which our decision may have upon the affairs of the people of this state.

The Massachusetts Constitution, written in 1780, expresses the view which prevails today, insofar as we have been able to ascertain the trend of opinion:

The legislature ought frequently to assemble for the redress of grievances, for correcting, strengthening and confirming the laws, and for making new laws, as the common good may require.

Mass. Const. pt. 1, art. 22.

Before proceeding to the question of interpretation, we think it fair to note some further facts which militate against a premise advanced by the petitioner, that a legislature sitting in unlimited session is a threat to the security of constitutional government.

First, it is significant that the Constitutional Revision Commission of the State of Washington has, in its final report of June 1969, recommended continuous legislative sessions, and has further recommended that the presiding officers should have the power to convene the legislature upon the written request of a majority of the members of both houses. Thus the commission established under executive order of the Governor in 1968, did not foresee the evils which loom so eminent to the petitioner if the legislature is permitted to determine the length of time necessary to transact the business before it.

As long ago as 1949, in a publication, The Background of Constitutional Revision in the State of Washington, Ernest H. Campbell, Assistant Director of the Bureau of Governmental Research and Services of the University of Washington, observed that amendments had been proposed to lengthen the sessions and to provide for annual sessions, and that restrictions upon the legislative process had been criticized.

In 1970 a seminar at the University of Washington Law School did research and prepared papers upon the subject of constitutional revision in Washington. It was the opinion of the student who reviewed the legislative article, that section 12 is the section which most urgently needs amendment, to lengthen the sessions and make the legislature a continuous body.[7]

We also take cognizance of the fact that there are only 18 states which limit the length of special sessions by constitutional or statutory provision. See 18 The Book of the States 1970-1971 (1970), published by the Council of State Gov-

[7] W. L. Britton, Review of the Legislative Article of the Washington Constitution as Amended, Constitutional Revision in the State of Washington (1970).

ernments, at pages 66-67. It is interesting to note that this publication reports Washington as having no limitations on the length of special sessions. The interpretation which the compilers of this table have placed upon article 2, section 12, is also shared, we note, by Armand G. Coigne, author of a book entitled Statute Making, published in 1948 by Commerce Clearing House. *See* the table beginning at page 106.

Of those states which do place time limitations upon special sessions, four (Idaho, New Hampshire, South Carolina and Tennessee) limit the number of days for which per diem can be paid only, so the session may continue if the legislators are willing to serve without this remuneration. Three (Alaska, Kansas and South Carolina) have annual regular sessions with no time limitations, three (Louisiana, New Mexico and Florida) have annual sessions, though limited in duration, and two (Texas—140 days, Missouri—6 months) have long regular sessions. In two of the states which do not have annual regular sessions (Arkansas and Virginia), the regular session can be extended.

In only five states are the time limitations as rigid as the petitioner contends they are under our constitution. These are Alabama, Indiana, Utah, Virginia and Montana. And in four of these, the constitutions refer specifically to extraordinary sessions in imposing the limitations. There is no evidence that our constitution was patterned after any of these.

Only in the constitution of Montana do we find a limitation couched in language similar to ours. Article 5, section 5, of the Montana Constitution provides for the remuneration of legislators and contains this sentence regarding the length of sessions:

No session of the legislative assembly, after the first, which may be ninety days, shall exceed sixty days.

No reference is made in that section to extraordinary sessions as such, but section 6, which specifies the time and place of meetings of the legislature, states that the legislative assembly shall meet "at other times when convened by

the governor." It is significant that, while the compiler of the table contained on pages 66-67 of The Book of the States 1970-1971, *supra,* has interpreted the Montana Constitution as imposing a limit upon the length of extraordinary sessions, the Supreme Court of that state has not done so. While, insofar as we have been able to ascertain, the question has not been squarely presented to that court, it has referred to the limitation as a limitation upon the "regular sessions" of the legislature. *Standard Oil Co. v. State Bd. of Equalization,* 110 Mont. 5, 99 P.2d 229 (1940). *See also State ex rel. James v. Aronson,* 132 Mont. 120, 314 P.2d 849 (1957), wherein the 60-day limitation is discussed as it applies to a regular session. The court in that case noted the similarity of the provision to that contained in the Washington Constitution and cited *State ex rel. Hamblen v. Yelle,* 29 Wn.2d 68, 185 P.2d 723 (1947), and *State ex rel. Robinson v. Fluent,* 30 Wn.2d 194, 191 P.2d 241 (1948), in support of its decision that such a limitation upon the regular session does not preclude the legislature from setting up a legislative council to function during the interim.

While article 5, section 5, of the Montana Constitution is similar to article 2, section 12, of our constitution in that the time limitation is placed upon "sessions" without specifically designating whether the limitation applies to regular sessions, extraordinary sessions, or both, there is a significant difference. The Montana Constitution declares that no session of the legislative assembly, after the first, shall exceed 60 days, whereas article 2, section 12, of the Washington Constitution does not employ this emphatic terminology. But we think that one who carefully examines the Montana constitutional provisions will find that, even there, the limitation is not free from ambiguity.

Our exploration thus far has revealed, first, that there is no sound reason of public policy for reading into a constitution a limitation upon the length of sessions which is not clearly expressed there, since such limitations hamper rather than aid the proper functioning of the legislative body; and, second, that the majority of states do not impose

rigid limitations upon the length of time which the legislature may function, at least when it is convened in extraordinary session. We have discovered that such rigidity as that which the petitioner contends is imposed by our constitution is rare. Consequently, there appears no reason to assume that the framers intended to limit the length of extraordinary sessions.

We are cited to no case construing a provision similar to ours, or for that matter dealing with the question before us. The journals of the Constitutional Convention are silent as to any debate upon the provision. They do, however, show that the Knights of Labor Assembly No. 115 submitted a petition "[t]o have annual legislative sessions with no restriction on their length."[8] The journal states that Mr. Newton presented the petition, that it was read, and that its

[s]ection ten, providing the annual sessions of the Legislature and no restrictions to be placed on the length of the session, [was] referred to the Committee on Legislative Department.[9]

In these instances, the words "the sessions" were used clearly with reference only to regular sessions. The editor of the published journal notes that the 1848 Wisconsin Constitution, the 1879 California Constitution, the 1857 Oregon Constitution, and the 1864 Nevada Constitution had similar provisions, but an examination of these will show that none of them expressed their limitations in language like ours, and only Nevada limited the special sessions.[10] Those constitutions, therefore, or interpretations placed upon them, if such interpretations exist, would afford us scant assistance in our search for the meaning of article 2, section 12, of the Washington Constitution.

---

[8]B. Rosenow, The Journal of the Washington State Constitutional Convention 1889 (1962) at page 531.

[9]*Ibid.*, pp. 149-50.

[10]Article 4, section 29, was repealed in 1958 and there is now no time limit contained in the Nevada Constitution.

The petitioner declares that the meaning is clear—"the sessions" means "all sessions." However, we are not convinced that the provision is without ambiguity. We think that if the phrase, "unless specially convened by the governor," were not contained in the second sentence of the provision, it would be clear that all of the provisions of the section pertain only to regular sessions. Obviously, the clause which follows this phrase, "but the times of meeting of subsequent sessions may be changed by the legislature," refers only to regular sessions. This is so because the times of meeting of special sessions must, by definition, be set by the Governor.

Thus it is apparent that in the clause immediately preceding the sentence with which we are concerned, and immediately following the reference to special sessions, the framers used the word "sessions" to refer only to regular sessions. Did they then intend to use the word in a different sense the next time they used it? It would seem that if the framers, having used the words "the sessions" in one clause to signify regular sessions only, had intended their next use of it to apply to special sessions as well, they would have been careful to make that intention clear by so stating.

It is undoubtedly true that when the word "session" is used without modifying words in the constitution, it generally refers to any session. For example, the per diem compensation provided in Const. art. 2, § 23, is obviously intended to apply to special sessions as well as regular sessions, and the privilege of freedom from arrest during the session, provided in section 16, applies during the special session as well as during the regular session. However, the fact that in some instances the framers used the word to apply to all sessions, does not preclude a finding that in others, they used it in a more limited sense.

Judge Cooley, in his work, 1 A Treatise on the Constitutional Limitations (8th ed. 1927), said at page 135:

> As the general thing, it is to be supposed that the same word is used in the same sense wherever it occurs in a constitution. Here again, however, great caution must be

observed in applying an arbitrary rule; for, as Mr. Justice *Story* has well observed: "It does not follow, either logically or grammatically, that because a word is found in one connection in the Constitution with a definite sense, therefore the same sense is to be adopted in every other connection in which it occurs. This would be to suppose that the framers weighed only the force of single words, as philologists or critics, and not whole clauses and objects, as statesmen and practical reasoners. . . ." And he gives many instances where, in the national Constitution, it is very manifest the same word is employed in different meanings. So that, while the rule may be sound as one of presumption merely, its force is but slight, and it must readily give way to a different intent appearing in the instrument.

(Footnotes omitted.)

 Reading Const. art. 2, § 12, as a whole, it is obvious that the framers here were thinking primarily of the regular sessions of the legislature. Their attention was focused upon such sessions, but, appropriately, the framers noted the power of the Governor to call special sessions. This power was not granted in article 2, dealing with the legislature and its powers, but rather in article 3, the executive article. Section 7 of that article provides that the Governor may convene the legislature upon extraordinary occasions. He is required to state the purposes for which the legislature is convened, but we find in this section no limitation placed upon the length of time which the legislature may sit to consider the matters which come before it on these occasions. It would seem safe to surmise that, if the framers had intended to limit the length of the sessions provided for in this article, they would have mentioned that limitation in the section wherein they set forth the power of the Governor to convene the legislature.

We have refused to find implied in this provision a restriction of the subject matter which the legislature may consider in extraordinary session. *State v. Fair*, 35 Wash. 127, 76 P. 731 (1904).

It is not illogical to suppose that the framers did not

intend to place a time limit upon special sessions. It is doubtful that it occurred to them that the business involved in such sessions might involve a considerable length of time. Extraordinary sessions were rare until recent years. During the 33 years of territorial government which preceded statehood, the territorial assembly had met only once in special session, and that session (in 1881) lasted only 5 days. The first special session after adoption of the constitution, which occurred in 1890, lasted only 8 days. It is true that the second, 19 years later, and the fourth, in 1925, lasted 60 days. But aside from a 38-day session in the height of the depression, 1933, there was no other extraordinary session lasting more than 10 days before 1955. Since that time, the frequency, as well as the length of special sessions, has steadily increased.

Thus it is doubtful that the framers of the constitution had in mind any thought that a limitation upon the length or frequency of special sessions was necessary or desirable.

We do not agree with the petitioner's position that the legislature itself and the Attorney General have always construed the constitutional provision in question as applying to extraordinary sessions. The question never arose at all until 1909. At that time the chief clerk of the house of representatives asked the Attorney General for an opinion, being in doubt himself. The Attorney General said that "clearly" the session could not be extended beyond 60 days. However, this opinion was not accepted as the final word, for again in 1925, an opinion was asked. This time the request came from the speaker of the house of representatives. He was advised that in the opinion of the then incumbent Attorney General, the limitation applied only to regular sessions. However, the legislature "played it safe" and adjourned on the 60th day.

In 1949, a senator asked the Attorney General for an opinion and was advised that there was no time limit on special sessions. In 1963, the question was asked again and the same answer was given. Apparently, however, doubts still remained in 1969, when the question was asked again,

this time by the Governor. This time the Attorney General expressed the opinion that the time limitation appeared on its face to apply to special sessions, but that the matter was in doubt.

This history does not support the petitioner's claim that the legislature or the Attorney General have consistently interpreted the constitutional provision as applicable to extraordinary sessions. On the contrary, it exemplifies a consistent viewing of the provision as ambiguous.

It also is revealing that the legislature itself, soon after the constitution was adopted and in pursuance of the authority vested in it by article 2, section 12, proceeded to change the time of the meeting of its regular sessions, in this language:

> The third legislature of the state of Washington shall meet on the second Monday of January, A. D. 1893, and sessions of the legislature shall be held biennially thereafter, commencing on the second Monday of January.

RCW 44.04.010. Note that the legislature saw no need to modify the word "sessions" with the word "regular" to make its meaning clear.

Bearing in mind that the constitution is a restriction and not a grant upon the legislative power, and that all doubts must be resolved in favor of that power, we can only conclude that the petitioner has failed to demonstrate that the framers of the constitution intended to make the 60-day limitation applicable to extraordinary sessions. The last sentence of Const. art. 2, § 12, logically applies only to regular sessions. At the very least, its meaning is doubtful. Consequently, we must hold that it does not constitute a restraint upon the power of the legislature to sit, when in extraordinary session, until the business before it has been concluded.

The petition is dismissed.

HAMILTON, C.J., HUNTER, HALE, NEILL, STAFFORD, and WRIGHT, JJ., and OTT, J. Pro Tem., concur.