[No. 43397. En Banc. January 2, 1975.]

CITIZENS COUNCIL AGAINST CRIME, *Petitioner,* v. WILLIAM E. BJORK *et al., Respondents,* DANIEL J. EVANS, *as Governor, Intervenor.*

*James C. Young* and *Richard T. Cole*, for petitioner.

*Slade Gorton, Attorney General,* and *James K. Pharris, Assistant,* for respondents.

*Slade Gorton, Attorney General,* and *Chi-Dooh Li, Special Assistant,* for intervenor.

ROSELLINI, J.—This matter is before the court upon an application for a writ of prohibition, sought for the purpose of prohibiting the director of the Gambling Commission of the State of Washington from issuing any licenses under Laws of 1974, 1st Ex. Sess., ch. 155. The petitioner alleges that it is a nonprofit corporation, whose members are taxpayers and representatives of various business interests in the state of Washington. It alleges that the questions raised in its application are of great public interest and that an opinion of this court is needed to clarify the constitutional duties of the legislature in overriding gubernatorial item vetoes.

The action does not involve an attack upon the provisions of chapter 155, which consist of five items which the Governor of the state vetoed in Substitute House Bill No. 473 when it was submitted to him after passage by both houses of the legislature. The bill as originally passed, less nine items vetoed by the Governor, went into effect on July 24, 1974, as Laws of 1974, 1st Ex. Sess., ch. 135, and on the same day chapter 155 went into effect. The constitutionality of chapter 135 is not questioned in this action, and chapter 155 is attacked solely upon procedural grounds.

■ It is the general rule that one who attacks the constitutionality of an act must show that its enforcement operates as an infringement of his constitutional rights. *Kitsap County v. Bremerton*, 46 Wn.2d 362, 281 P.2d 841 (1955). There has been no showing by the petitioner that its constitutional rights are infringed by chapter 155, or indeed that it is directly affected by the law in any manner.

■ The rule requiring a showing that the plaintiff's rights are affected is relaxed somewhat in taxpayer suits. We have permitted the validity of statutes to be questioned in taxpayer actions properly instituted after making demand upon the Attorney General. *See, for example, Calvary Bible Presbyterian Church v. Board of Regents*, 72 Wn.2d 912, 436 P.2d 189 (1967). The petitioner, however, is not a taxpayer. It alleges that its members are taxpayers, but they are not parties to this action. We cannot treat it as a taxpayer suit.

■ Furthermore, it does not appear that a writ of prohibition can properly be issued in a case of this kind. The original jurisdiction of this court is defined by the constitution. Const. art. 4, § 1. In *State ex rel. White v. Board of State Land Comm'rs*, 23 Wash. 700, 702-03, 63 P. 532 (1901), we said:

> By § 1, art. 4, of the state constitution, this court has power to issue writs of prohibition. When our constitution was adopted, the courts and text writers of this country generally held that the writ was to restrain the exercise of unauthorized judicial or quasi judicial power, and that the remedy might be invoked against any court, or body of persons, board, or officers assuming to exercise judicial or quasi judicial powers, although not strictly or technically a court. High, Extraordinary Remedies (3d ed.), § 764a. Undoubtedly this is the function the writ is to perform under our constitution. The writ, as so understood, was to prohibit proceedings of a judicial nature, but not to prohibit merely administrative, executive, or ministerial acts. [Citing authorities.] "And, to warrant granting the writ to any organized body other than a court, it is necessary that the acts sought to be prohibited are purely judicial, and not executive, administrative, or

legislative." Spelling, Extraordinary Relief, § 1744. If the court or organized body in the particular is acting only in an administrative or executive capacity, although in other matters it may exercise judicial powers, a writ of prohibition is not the proper remedy, however illegal such administrative or executive acts may be.

By statute, RCW 7.16.290 *et seq.*, the superior courts have a broader power in issuing the writ and may use it to control administrative, legislative or executive acts, where such acts are in excess of the power of the person or body to whom the writ is directed. *Winsor v. Bridges*, 24 Wash. 540, 64 P. 780 (1901). In accord with the common law, the writ must be sought by a person beneficially interested. RCW 7.16.300. *See* Annots., 159 A.L.R. 627 (1945) and 115 A.L.R. 3 (1938), *Availability of writ of prohibition as means of controlling administrative or executive boards or officers.*

The annotation in 115 A.L.R. states, at page 4:

[I]t is the well-settled general rule in the absence of a statute or constitutional provision extending the scope of the common-law writ of prohibition, that the writ lies only against officers possessing or assuming functions or powers of a judicial character, and it will not issue to prevent the performance of ministerial or administrative acts or functions.

The annotation at 159 A.L.R. 627 states that the rule was confirmed by subsequent decisions. *See also State ex rel. Harris v. Hinkle*, 130 Wash. 419, 227 P. 861 (1924); *State ex rel. Murphy v. Taylor*, 101 Wash. 148, 172 P. 217 (1918); 63 Am. Jur. 2d *Prohibition* §§ 1-3 (1972). *And see* L. Larson, *Administrative Determinations and the Extraordinary Writs in the State of Washington*, 20 Wash. L. Rev. 23, 81, at 86 (1945).

As this court stated in *State ex rel. Bennett v. Taylor*, 54 Wash. 150, 102 P. 1029 (1909), regardless of the stipulation of the parties, the first duty of this court is to inquire into its power to grant the writ.

■ We have held that the issuance of licenses, the action which the petitioner seeks to prohibit, is not a judicial or quasi-judicial function. *Household Fin. Corp. v. State*, 40 Wn.2d 451, 244 P.2d 260 (1952). We there said that an act of the legislature which purported to vest in the superior court the right to reverse on a trial de novo a decision of the supervisor of banking as to whether or not a license should issue was unconstitutional as an attempt to vest a nonjudicial power in a constitutionally created court. *Accord, Floyd v. Department of Labor & Indus.*, 44 Wn.2d 560, 269 P.2d 563 (1954). *See State ex rel. Hood v. State Personnel Bd.*, 82 Wn.2d 396, 511 P.2d 52 (1973), wherein the test for determining whether an agency action is judicial is again set forth.

It therefore appears that, insofar as the petitioner is concerned, this action cannot be maintained. However, the Governor has intervened and asserts that the propriety of the procedure followed by the legislature is a question of great importance to him, in his official capacity. He is interested in receiving the court's interpretation of the constitution as it relates to the legislative power to override the Governor's veto of an item in a bill.

■ In consideration of the comity existing between the judicial and executive branches of the state government, we will treat the Governor's intervention as a request for an advisory opinion upon the questions argued in his brief. While this court is reluctant to give advisory opinions, it has done so on extraordinary occasions, a notable example being *Distilled Spirits Institute v. Kinnear*, 80 Wn.2d 175, 492 P.2d 1012 (1972). We there said that where the question presented is one of great public interest and has been brought to the court's attention in an action wherein it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to other branches of the government, it may exercise its discretion and render a "declaratory judgment" to resolve a question of constitutional interpretation.

In the case before us, the pertinent stipulated facts are: The House and Senate passed Substitute House Bill 473. It became an enrolled bill, signed by the Speaker of the House of Representatives and the President of the Senate and transmitted to the Governor, who vetoed nine items. The Chief Clerk of the House filed the bill and the veto message with the Secretary of State.

When the legislature reconvened, the House voted upon seven of the Governor's partial veto items and passed six of them by the requisite two-thirds majority. The Senate considered these vetoed items and passed by a two-thirds majority five of the six items that had been passed by the House.

The bill was returned to the Chief Clerk of the House of Representatives with a transmittal message outlining the action taken by the Senate. The Chief Clerk filed the bill with the Secretary of State, together with a message indicating the partial vetoes overridden by the legislature.

Const. art. 2, § 22, provides:

No bill shall become a law unless on its final passage the vote be taken by yeas and nays, the names of the members voting for and against the same be entered on the journal of each house, and a majority of the members elected to each house be recorded thereon as voting in its favor.

Const. art. 3, § 12, provides, in pertinent part:

Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor. If he approves, he shall sign it; but if not, he shall return it, with his objections, to that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider. If, after such reconsideration, two-thirds of the members present shall agree to pass the bill it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present, it shall become a law; but in all such cases the vote of both houses shall be determined by the yeas and nays, and the names of the

members voting for or against the bill shall be entered upon the journal of each house respectively. . . . If any bill presented to the governor contain several sections or items, he may object to one or more sections or items while approving other portions of the bill. In such case he shall append to the bill, at the time of signing it, a statement of the section, or sections; item or items to which he objects and the reasons therefor, and the section or sections, item or items so objected to, shall not take effect unless passed over the governor's objection, as hereinbefore provided.

The contention is that the failure of the Senate to override the veto on all six items constituted an "amendment of a bill" and, under Const. art. 2, § 22, that consequently, it should have been presented to the House for concurrence and final passage, and, under Const. art. 3, § 12, for approval by two-thirds of the members present.

The intervenor recognizes the applicability of the enrolled bill doctrine where contentions such as these are raised.[1]

The force of that doctrine in a case of this kind was expressly recognized in *State ex rel. Dunbar v. State Bd. of*

---

[1]In the leading case of *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 P. 201 (1893), the rule was laid down that the enrolled bill on file in the office of the Secretary of State, which is duly signed by the presiding officers of both houses (as required by Const. art. 2, § 32, and art. 3, § 17) and otherwise appears fair upon its face, is conclusive evidence of the regularity of all proceedings necessary for its proper enactment in accordance with the constitutional provisions.

We have applied the doctrine to preclude inquiries as to whether a bill was properly repassed after the Governor's veto (*State ex rel. Dunbar v. State Bd. of Equalization,* 140 Wash. 433, 249 P. 996 (1926)), whether it was passed by the legislature after the expiration of the 60-day period prescribed for the regular session (*Morrow v. Henneford,* 182 Wash. 625, 47 P.2d 1016 (1935)), or whether an amendment changed the scope and object of a bill (*State ex rel. Bugge v. Martin,* 38 Wn.2d 834, 232 P.2d 833 (1951); *Roehl v. PUD 1,* 43 Wn.2d 214, 261 P.2d 92 (1953)). We have refused to inquire whether the members of the Senate were deceived by the title of a bill. (*State ex rel. Wash. Toll Bridge Authority v. Yelle,* 61 Wn.2d 28, 377 P.2d 466 (1962). *See also Derby Club, Inc. v. Becket,* 41 Wn.2d 869, 252 P.2d 259 (1953)).

We have said that an investigation of the antecedent history of the passage of a bill will not be made except as may be necessary in case

*Equalization,* 140 Wash. 433, 249 P. 996 (1926), a case which the intervenor finds it difficult to distinguish. However, since we are not entertaining this action as an attack upon the constitutionality of a statute but rather, as in *Distilled Spirits Institute v. Kinnear, supra,* as a request for an advisory opinion, we will disregard the doctrine in order to accomplish this purpose.

The theory advanced is that when the Governor vetoed certain items in Substitute House Bill 473, after it had been passed by both houses of the legislature, the vetoed items lost their identity with the original bill. When the House overrode the veto on certain of the vetoed items, he contends, these then formed a new bill; and when the Senate failed to override the veto on all six items, it thereby amended the bill. Citing cases which have held that an amended bill must be returned to the house of its origin for approval, the Governor maintains that the House should have acted once more upon his vetoes in order for any of the vetoed items to become a law.

The trouble with this theory is that it finds no expression in the words used by the people in framing the constitu-

of ambiguity in the bill when the legislative intent must be determined. *Shelton Hotel Co. v. Bates,* 4 Wn.2d 498, 104 P.2d 478 (1940).

The constitutional principle upon which this doctrine is based is that the three branches of state government are co-equal in dignity and that none of them is entitled to look behind the properly certified record of another to determine whether that branch has followed the procedures prescribed by the constitution, but rather each is responsible and answerable only to the people for its proper performance of the function for which it is constituted.

An additional reason of public policy which supports the doctrine is that it is necessary in order that the people may rely upon the statutes as setting forth the laws which have been enacted by the legislature. If the enrolled bill were not taken as conclusive evidence that it was regularly and constitutionally enacted, Judge John P. Hoyt (who had served as President of the Constitutional Convention) said, it would be

> practically impossible for the courts even to determine what was the law, and would render it absolutely impossible for the average citizen to ascertain that of which he must at his peril take notice.

*State ex rel. Reed v. Jones, supra* at 456.

tion. The procedure for enacting a bill is provided in Const. art. 2. The veto procedure and the procedure for overriding a veto are contained in Const. art. 3, § 12. That section provides that if a vetoed bill or item is passed by a two-thirds majority of both houses, over the Governor's veto, it shall become a law. Here, five items were passed in this manner. Under the self-executing provisions of Const. art. 3, § 12, they were thereby enacted into law.

Reading this section of article 3 as a whole, we find nothing to indicate that the framers intended that, upon reconsidering vetoed items, the legislature should treat them as a new bill, independent of the bill in which they were originally enacted.

Viewed outside the bill in which they were contained, they are unintelligible. They have meaning only when read in the context of the bill as a whole. We have no doubt that that is the context in which the legislature viewed them. It is the context in which they appeared when the bill was filed with the Secretary of State.

It is argued that the people must have intended that the House should reconsider items upon which it has overridden the gubernatorial veto. Otherwise, it is said, if the Senate does not vote to override each item, the meaning and purpose of the other items might be affected to such an extent that the House would no longer desire to override the veto on any or a part of them. It may be conceived that such a situation could arise; it can equally be conceived that the House or the Senate or both might wish to reconsider the entire bill in the light of gubernatorial vetoes not overridden. Yet, it is not suggested that either house would have the right to withdraw its approval of any portion of the bill which was not vetoed by the Governor.

Whether or not a reconsideration of the entire bill or of vetoed parts of it would be desirable, the fact is that the framers of the constitution did not provide for such reconsideration. Const. art. 3, § 12, provides for a return of the vetoed or partially vetoed bill to the house of its origin,

where it can be voted upon again. If an item receives the necessary majority, it goes to the other house, which votes, and if it receives the necessary majority, it thereupon becomes law. There is no provision for return of the bill or items to the originating house for reconsideration. Consideration of the bill or item is ended after both houses have acted upon it and voted to override the veto.

In *State ex rel. Dunbar v. State Bd. of Equalization, supra*, it was contended that a vetoed bill had to be signed again by the Speaker of the House and the President of the Senate if it was passed over the Governor's veto. It was suggested that the enrolled bill was invalid on its face because it had not been signed twice. In rejecting this contention, this court emphasized that provision of Const. art. 3, § 12, which states that a vetoed bill, when passed by a two-thirds majority of both houses, shall become a law. We pointed out that no further constitutional requirements attached, and the legislature was free to provide its own method of advising the Secretary of State that the veto had been overridden. That decision is in harmony with our opinion here.

HALE, C.J., and FINLEY, HUNTER, HAMILTON, STAFFORD, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.