[No. 47752-3. En Banc. August 31, 1983.]

THE CITY OF SEATTLE, ET AL, *Respondents,* v. THE STATE OF WASHINGTON, ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General, Robert F. Hauth, Senior Assistant,* and *James R. Tuttle, Assistant,* for appellants.

*Douglas N. Jewett, City Attorney,* and *Jorgen G. Bader* and *Susan R. Sampson, Assistants,* for respondents.

*James B. Street* on behalf of Washington Common Cause, amicus curiae for respondent City of Seattle.

DORE, J.—The City of Seattle and its Elections Administrator, Alan W. Miller, brought this suit as plaintiffs against the State of Washington and Robert V. Graham, State Auditor, for declaratory relief. The complaint asked the court to declare valid certain city ordinances which provide partial campaign funding for candidates in city elections. On motion for summary judgment, the trial court found the ordinance constitutional.

Seattle City Charter, art. 18, § 4 declares the City of Seattle shall require public disclosure of campaign contributions to and expenditures by or on behalf of candidates and ballot issues. In 1977, pursuant to this provision, the City enacted ordinance 106653, requiring campaign disclosures and creating a Fair Campaign Practices Commission which makes rules and hears complaints arising under the ordinance. In November 1978, the Seattle City Council enacted ordinance 107772, adding new sections which place mandatory limitations on campaign contributions. It also authorizes the use of City funds to partially finance the political campaigns of candidates for City office who choose to apply and who qualify under the ordinance. There are restrictions on the number and amounts of private contri-

butions to be accepted by those receiving this assistance, and recipients agree to comply with the mandatory requirements of the ordinances and, in addition, to limit their expenditures.

During the 1979 election, the City disbursed matching funds to 11 candidates for positions on the Seattle City Council and the offices of comptroller and treasurer. The funding program is open to incumbents as well as other candidates who qualify.

The ordinance was designed to encourage the widest participation of the public in the electoral process, thus reducing the dependency of candidates on special interest contributions. The Council reasoned that voluntary campaign expenditure limitations, coupled with provisions of public funds, would free candidates from the time expended in raising funds, increasing the time available to the candidate for issue discussions.

The campaign matching fund program matches donations from private citizens to an eligible candidate who has timely signed the campaign contract, to a maximum of $50 per individual. Seattle Municipal Code 2.04.450(A), ordinance 107772, § 13–I(a). The campaign financing ordinance establishes eligibility criteria and expenditure limits, requires candidates to sign a campaign contract, and matches only qualified funds.

To be eligible, a candidate must demonstrate a community following by raising a base amount of funds from at least 100 city residents.[1] In the campaign contract, a candidate agrees to limit his contributions and loans to his own campaign, and comply with specific reporting requirements

---

[1]Seattle Municipal Code 2.04.440(A), section 13–H(a) of ordinance 107772, provides in part:

"1. For the office of Mayor [a candidate must] either: (a) receive Twenty Thousand Dollars ($20,000.00) from at least one hundred contributors, or (b) receive three hundred contributions of Ten Dollars ($10.00) or more;

"2. For the offices of City Council, City Attorney, City Comptroller or City Treasurer [a candidate must] either: (a) receive Seven Thousand Five Hundred Dollars ($7,500.00) from at least one hundred contributors, or (b) receive two hundred contributions of Ten Dollars ($10.00) or more."

and methods of receiving funds.[2] None of these limitations on spending apply to candidates who do not accept campaign matching monies. The campaign contract must be signed within 30 days after an aspirant becomes a candidate or files for office, whichever is sooner. Seattle Municipal Code 2.04.410B, ordinance 107772, § 13-E. The ordinance provided for automatic repeal of sections 13-A through 13-M on November 15, 1982, at which time the Council was to review the effectiveness of the program. The Council did not reenact the ordinance, and it has now expired.

In upholding the constitutionality of the Seattle ordinance, the trial judge reasoned there was a potential for corruption which warranted some program for controlling campaign contributions. The trial court ruled that the Seattle campaign matching fund program is lawful because (1) the program serves a public purpose, and (2) disbursements under the program do not constitute gifts in either the common law or constitutional sense. We agree.

I

We first must determine if the expiration of the ordinance has rendered the matter moot. Counsel for the City of Seattle have advised the court that the mayor plans to

---

[2] The campaign contract provides that the candidate will

1. Limit his or her own contributions and loans to the campaign to no more than $1,000 in any campaign year (Seattle Municipal Code 2.04.420);

2. Limit total campaign expenditures to $150,000 if running for mayor, and $50,000 in races for other city offices (Seattle Municipal Code 2.04.430);

3. Spread campaign spending so that no more than 75 percent of the applicable limit is spent through primary election day (Seattle Municipal Code 2.04.430);

4. Use campaign contributions for direct campaign purposes only—no campaign funds may be used for personal support or to make a donation to another's campaign (Seattle Municipal Code 2.04.470);

5. Return one-half of unexpended campaign funds after the election (Seattle Municipal Code 2.04.450D);

6. Comply with continuous reporting requirements and substantiating vouchers (Seattle Municipal Code 2.04.270); and

7. Abide by rulings and interpretations of the elections administrator with respect to campaign contributions and terms (contract article 8, Clerk's Papers, at 209).

resubmit the ordinance for enactment at a later date. The issue of the legality of the money received by some candidates would undoubtedly be tested at that time. It is, therefore, clear that this matter is not moot. Additionally, we believe a case involving the public financing and limiting of campaign expenditures for political candidates is of such public importance there is "continuing and substantial public interest".

■ In *Citizens Coun. Against Crime v. Bjork,* 84 Wn.2d 891, 895, 529 P.2d 1072 (1975), we stated:

> While this court is reluctant to give advisory opinions, it has done so on extraordinary occasions, a notable example being *Distilled Spirits Institute v. Kinnear,* 80 Wn.2d 175, 492 P.2d 1012 (1972). We there said that where the question presented is one of great public interest and has been brought to the court's attention in an action wherein it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to other branches of the government, it may exercise its discretion and render a "declaratory judgment" to resolve a question of constitutional interpretation.

The subject case is one of great public interest, has been thoroughly briefed, has been twice argued before the full court, and involves constitutional issues. We, therefore, shall resolve the substantive issues involved.

## II

■ In resolving the legality of Seattle's campaign financing ordinance, we must address ourselves to the following issues:

(A) Does the City's campaign financing ordinance violate article 8, section 7 of the Washington State Constitution?

(B) Does such ordinance violate the provision in article 7, section 1 of the Washington State Constitution that "[a]ll taxes . . . shall be levied and collected for public purposes only" and related sections 12 and 14 of article 11?

(C) Does the City's campaign financing ordinance vio-

late RCW 42.17.130 and its counterpart in the City ordinance which forbids use of public office or agency facilities in campaigns?

(D) Is the mayor or any incumbent city council member disqualified by RCW 42.20 from receiving campaign matching funds as a candidate?

Municipal ordinances are presumed to be constitutional, and an attacker bears the burden of showing the invalidity of an enactment beyond a reasonable doubt. *Bellevue v. State,* 92 Wn.2d 717, 600 P.2d 1268 (1979).

### III

The Seattle campaign finance law does not authorize a public gift or subsidy in violation of article 8, section 7 of the Washington State Constitution.

Seventeen states now provide public assistance in various forms to candidates for public office. If a candidate does not accept the campaign funding contract, these limits cannot be imposed. In *Buckley v. Valeo,* 424 U.S. 1, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976), the United States Supreme Court was confronted with a comprehensive elections reform law which included among its provisions: (1) a mandatory limit on personal funds which a candidate could expend on his own campaign; (2) a mandatory limit on total expenditures by a candidate during an election campaign; and (3) a program of public financing of election campaigns which conditioned acceptance of public funds on an agreement by the candidate to abide by specific expenditure and personal contribution limitations. The latter provision accomplished the same results as the first two, but by contract rather than by mandatory prohibition.

With respect to the mandatory limit on use of personal funds, the United States Supreme Court held that, notwithstanding the argued interest in equalizing the relative financial resources of candidates competing for public office, "the First Amendment simply cannot tolerate § 608 (a)'s restriction upon the freedom of a candidate to speak

without legislative limit on behalf of his own candidacy". *Buckley,* at 54. The Court similarly held that the *mandatory limit* on total campaign expenditures by a candidate was in conflict with the First Amendment. *Buckley,* at 57–58. The Court found, however, there was *no* such First Amendment problem where acceptance of expenditure limitations is part of an agreement to obtain public funds. *Buckley,* at 58.

The constitutionality of expenditure limits coupled with public funding was addressed in greater depth in *Republican Nat'l Comm. v. Federal Election Comm'n,* 487 F. Supp. 280 (S.D.N.Y.), *aff'd,* 445 U.S. 955 (1980). *Republican Nat'l Comm.* was decided by a specially convened 3–judge court. It was appealed directly to the Supreme Court where it was unanimously affirmed. The 3–judge court relied on footnote 65 at page 57 of *Buckley v. Valeo, supra,* in concluding that the contractual expenditure limits did not violate First Amendment rights so long as candidates are free *not* to enter into the agreement but, alternatively, can spend an unlimited amount of private funds. The court stated in *Republican Nat'l Comm.* at page 284:

> If the candidate chooses to accept public financing he or she is beholden unto no person and, if elected, should feel no post–election obligation toward any contributor of the type that might have existed as a result of a privately financed campaign.

The court in *Republican Nat'l Comm.* at page 285 continued:

> Here the conditions imposed by Congress upon receipt of public campaign financing do not infringe upon the First Amendment rights of candidates. But even if they were so viewed, the burden attributable to the limits imposed by the legislation is fully justified by the compelling state interests described above.

Similarly, under the Seattle ordinance, if a candidate agrees to the spending limit, public funds will displace rather than merely supplement private funds, thus reducing the candidate's reliance on private contributions.

■ In *Bare v. Gorton,* 84 Wn.2d 380, 526 P.2d 379 (1974), this court struck down a law that would have established a *mandatory limitation* on campaign expenditures. The law was found to be unconstitutional "for lack of narrow regulation drawn with precision and specificity". *Bare,* at 386. It was also found to be defective under the First Amendment "because it can operate *to prohibit absolutely* plaintiff and others from exercising their constitutionally guarantied freedom of speech". (Italics ours.) *Bare,* at 385. This "potential of absolute prohibition" is the same concern for mandatory limits found to be crucial by the *Buckley* Court. *Bare,* at 386. The campaign contributions limitations in the Seattle ordinance, however, are *voluntary,* not *mandatory,* and are permitted under *Buckley.*

■ The fundamental object or purpose of all judicial construction or interpretation is to ascertain and give effect to the intention of the lawmakers in enacting a statute. *Graffell v. Honeysuckle,* 30 Wn.2d 390, 399, 191 P.2d 858 (1948). Article 8, section 7 was added to the state constitution primarily as the result of the public's fear that large private corporations were successfully prevailing upon public officials to divert public monies into corporate stockholders' pockets. The difference between aid to private railroads in the business of making money for their stockholders and expenditure of public funds for limited purposes as part of an effort to prevent dominance of the electoral process by special interests dramatizes the inapplicability of Const. art. 8, § 7 to Seattle's ordinance.

■ The electoral process belongs to the public and has no counterpart in the private sector. In such a context, the words "gift" and "subsidy" as conceived by the drafters of Const. art. 8, § 7 have no application. Section 13 of ordinance 107772, codified as Seattle Municipal Code 2.04.400–.480, provides that public campaign funds may be used *only for direct campaign purposes.*[3] Such funds never leave the

---

[3]Section 2.04.470 provides:
"Public matching funds may be expended only for the receiving candidate's

public arena; they never go into the private pockets of the candidate for his own personal purposes. The candidate holds the funds in a fiduciary capacity and can spend only to further the objectives of the ordinance. When the campaign is over, all public funds not spent for those limited purposes must be returned to the City.

Seattle's program of election reform has no precedent in any of the prior Const. art. 8, § 7 cases. In all the cases, whether or not this court found adequate consideration, private individuals or enterprises received money or property which they retained for private use. But within the constraints of the First, Fifth and Fourteenth Amendments, the public has the power to enact rules and spend funds with the purpose of protecting the authority and integrity of the ballot box.

## IV
Seattle ordinance campaign contributions are entitlements.

Entitlements are a form of assistance provided to the public, or a segment of the public, as cash or services, in carrying out a program to further an overriding public purpose or satisfy a moral obligation. The overriding public purpose makes the private benefit incidental. Entitlements by their nature are equally available to anyone who qualifies under objective criteria.

The State and municipalities in Washington provide a variety of services without charge. Many are of great value to the recipients including:

Day care services for children of working mothers, AGO 18 (1975);

---

direct campaign purposes such as, but not limited to, purchasing campaign literature or media space or time, mailings, renting campaign headquarters, or paying for campaign headquarter telephones. A candidate who signs a campaign contract may use neither contributions nor public matching funds for indirect campaign purposes such as, but not limited to, providing a candidate's personal support, or for donation to another's campaign. Permissibility of an expenditure of public matching funds shall be determined by the Administrator of the Office of Election Administration."

Vaccination without charge to control disease or prevent epidemics;

Attorneys' services in enforcing support payments under the uniform reciprocal enforcement of support act (RCW 26.21);

Fare–free bus zones within a downtown area to reduce traffic congestion or air pollution;

Deferral of sales taxes upon investment projects under the Economic Assistance Act of 1972, RCW 43.31A.130–.140.

Where there is a close nexus to a government process or responsibility, cash payments may be made directly to those who comply with qualifying conditions. Some examples that have survived constitutional challenges are:

Veterans' bonuses. Former RCW 73.34.040.

Compensation to victims of a felony or gross misdemeanor under "Victims of Crime—Compensation, Assistance". RCW 7.68.

Reimbursement of court costs to those who act in self–defense or in defense of another in imminent danger of injury or death from a serious crime. RCW 9.01.200.

Attorneys' and expert witnesses' fees to a successful litigant in a condemnation case under RCW 8.25.070 and .075.

Relocation assistance payments to people and businesses displaced by a condemnation. RCW 8.26.

Campaign contributions distributed pursuant to the Seattle ordinance are another form of "entitlement" which attempts to ensure a representative democracy, where every citizen's vote has equal importance.

However, the most compelling reason for upholding the legality of the Seattle ordinance is best illustrated by the Public Disclosure Commission 1980 Election Financing Fact Book. It contains 174 pages, showing the contributions received by state officeholders, including state legislators. The information comes from the disclosure statement filed by each individual candidate.

The Public Disclosure Commission's survey reveals the

extent to which special interest groups are involved in the election process. There were 108 political action committees classified as "business related" which reported to the Public Disclosure Commission during 1980. Although this was an off–year election, their total receipts were $1,815,971 and expenditures were $963,778.[4]

Special interest political action groups are on the increase, and provided approximately 37 percent of the total amount that state legislative candidates had available to spend on their campaigns in 1980.[5] Only *four* of the 124 state legislators elected in 1980 were elected without assistance from special interest political action groups.[6] This increase in the influence of special interest groups is also present on the local level.

Last session, the Legislature passed an $8.5 billion 2–year budget, making decisions as to the level of spending for all state agencies. These decisions involved appropriations for the handicapped, physically disabled, institutions, schools, higher education, scholarships and highways, etc. After establishing the level of spending, the Legislature also had to levy the taxes to raise the $8.5 billion in appropriations. This meant determining where the tax money would come from, who gets the exemptions and/or deductions, and what sources to draw from in meeting their budget responsibilities. Who helped make these decisions—individual voters or the special interest groups who contributed large sums of campaign contributions? The trial judge below, in referring

---

[4]Public Disclosure Commission, Summary of Campaign Finance Reports for 1981 (1982), at 7.

[5]Public Disclosure Commission, 1980 Election Financing Fact Book (1981), at 171.

[6]*Public Disclosure Commission, 1980 Election Financing Fact Book* (1981), at 172. United for Washington, the largest political action committee, has grown by leaps and bounds. In 1974 they raised and disbursed $94,148; in 1976, $148,675; in 1978, $162,855; in 1980, $348,798.

In legislative races in 1981, United for Washington donated to 70 campaigns in individual amounts ranging from a high of $11,852 to a minimum of $500, or an average of $4,471.77.

to campaign contributions, said, "Money makes a difference no matter how honest a candidate, some difference".

V

Seattle's campaign finance ordinance has an underlying public interest.

The integrity of elections is essential to the very preservation of a free society. *State v. Conifer Enters., Inc.*, 82 Wn.2d 94, 508 P.2d 149 (1973) (upholding RCW 29.79-.490(4) which prohibits paying those circulating an initiative petition by a rate per signature collected). In *Fritz v. Gorton*, 83 Wn.2d 275, 284, 517 P.2d 911 (1974), our court took note of the concern about the influence of campaign contributions on politics, which led to Initiative 276 (RCW 42.17):

> We can note particularly that in recent years there has been more dissemination to the public of information as to campaign contributions and expenditures and the use and misuse thereof in the election of public officials. There has been more information about the proper and improper function of lobbying activities, in the decision–making processes of government, and more particularly in the enactment or nonenactment of legislation. There has been an increasing emphasis on the importance of the role of money, funds, and finances in regard to the aforementioned matters.

This case upheld detailed disclosure requirements of candidates for public office, including information of "a very personal and private nature". *Fritz*, at 286. The "public interest" was not seriously challenged at the trial level, nor can it be.

VI

The Seattle campaign finance law does not compel a violation by incumbent city officials of RCW 42.20 and RCW 42.23.

The trial court carefully considered the role of the mayor, the city council, the city council finance committee and the auditing committee under the city charter, and found that their functions would not bar the participation of the

elected officials in the campaign matching fund program:

> [T]he way the ordinance established [the] independence of the administrator and of the commission, and because of the entitlement nature [of the program], freely open to all who come, I think for either one of those reasons, but certainly with both elements there, the concerns appropriately raised by the defendant Auditor here regarding the Finance Committee and Auditing Committee responsibilities of the City, and specifically of the mayor and of the councilmen, I think is not of legal consequence.

Clerk's Papers, at 665.

 Campaign contracts are not made "under the supervision" of any elected official as contemplated by RCW 42.20.010 and RCW 42.23.030; the nature of the program as an entitlement with prescribed terms precludes the self-dealing, personal favoritism, or any unfair advantage accruing to an elected officeholder.

Neither the mayor nor any other city elected official has any power to control or direct the Fair Campaign Practices Commission or the elections administrator. The term "supervision" as used in RCW 42.20.010 and RCW 42.23-.030 contemplates a degree of direction and control. Accepted authorities define the word "supervise" as follows:

> To oversee *for direction*; to superintend; to inspect *with authority*.

(Italics ours.) *Webster's Second New International Dictionary* (1944).

> To oversee (a process, work, workers, etc.) during execution or performance; superintend; have the oversight *and direction* of.

(Italics ours.) *Random House Dictionary of the English Language* (1979).

> To oversee, have the oversight of, superintend the execution or performance of (a thing), the movements or work of (a person).

*Oxford English Dictionary* (1964).

No Washington case has applied either statute under any fact pattern where the affected official is so far removed from the actual decisionmaking process or authority involv-

ing the transaction as here.

Moreover, no Washington case has applied either statute in the case of entitlements, such as relocation assistance, veterans' benefits, victims' compensation, etc. Two related statutes, RCW 42.18.160(4)(b) and RCW 42.22.040, exclude government benefits extended to the public generally. By comparison, a public officer who apprehends a criminal while acting outside the scope of his or her official duties may claim the reward, *Board of Comm'rs v. Johnson,* 126 Kan. 36, 266 P. 749 (1928); 77 C.J.S. *Rewards* § 36, at 381 (1952), or receive as a bounty a portion of the fines collected from a violator, *United States v. St. Regis Paper Co.,* 328 F. Supp. 660 (W.D. Wis. 1971).

Emoluments of office are another exemption implied by necessity. The rule of necessity applies to judges, administrative agencies, executive officers, and legislative bodies. *Caminetti v. Pacific Mut. Life Ins. Co.,* 22 Cal. 2d 344, 139 P.2d 908, 920 (1943); 4 E. McQuillin, *Municipal Corporations* §§ 13.35, 13.35(a) (3d rev. ed. 1979). Here, the residual legislative and administrative powers of the city council and the mayor respectively adhere in the nature of municipal government. Applying RCW 42.20.010 and RCW 42.23-.030 as the Attorney General seeks would, therefore, effectively preempt any municipality's power to establish campaign financing legislation. Were that the intention, the Legislature would have used explicit language. Absent a clear and express prohibition, a local government's power to legislate continues. *Ritchie v. Markley,* 23 Wn. App. 569, 597 P.2d 449 (1979); *State ex rel. Schillberg v. Everett Dist. Justice Court,* 92 Wn.2d 106, 594 P.2d 448 (1979).

RCW 42.23 is directed at *self–dealing* where a public official would otherwise have the discretion to use his public office to favor his private interests over the interests of others. The Seattle ordinance is administered by an independent election administrator who performs the ministerial role of executing contracts with candidates based on purely objective criteria.

Furthermore, RCW 42.23.030 deals with the "*making*" of

a contract. The State's argument depends on a construction of "making" so that it means "general supervision" of the *implementation* of a contract *after* it has been made.

More importantly, even if the word "making" meant what the State said it meant, the State's argument incorrectly assumes that the campaign finance ordinance itself compels action by an elected official despite a conflict of interest. On the contrary, if at some point during implementation of a campaign funding contract, an elected member of the city auditing committee were to find himself in the position of possibly acting with respect to his own contract, there is nothing in the campaign ordinance or in the city charter that would compel him to act. In fact, the City's own code of ethics, ordinance 108882, compels him to disqualify himself. If he did not disqualify himself, then and only then would any conflict of interest violation occur. Full enforcement of RCW 42.23 or any other conflict of interest law does not require invalidation of the City's campaign finance law.

## VII

The City's campaign finance ordinance does not violate RCW 42.17.130 and its counterpart in Seattle City Charter, article 18, section 4, which forbids use of public office or agency facilities in campaigns.

The State, in asserting that Seattle's campaign finance law violates RCW 42.17.130 and Seattle City Charter, art. 18, § 4, ignores the purpose for which those provisions were enacted. The purpose intended was to prohibit the use of public facilities for partisan campaign purposes. The incumbent's use of publicly provided stamps to mail out his campaign literature is a typical example of the abuses which were targeted. Under the State's reading of this provision, the State and the City would be prohibited from publishing a voter's pamphlet.

When RCW 42.17.130 refers to "assisting *a* campaign for election of any person to any office" it means

assisting a specific campaign at the expense of other campaigns. (Italics ours.) An even–handed program of assistance available to *all* candidates based on objective minimum qualification criteria simply does not involve the abuses of public trust which inspired RCW 42.17.130.

Article 18, section 4 of the Seattle City Charter, adopted November 2, 1976 after State Initiative 276, was clearly intended to express in general terms the same intent; that is, that in the electoral process the public interest as expressed through the ballot box should prevail over special and private interests. That is precisely the purpose and effect of Seattle's campaign finance reform ordinance.

## CONCLUSION

The Seattle City Council intelligently and creatively passed an ordinance providing for a voluntary limitation of spending and partial public financing of candidates so the average person would have some chance of equal representation in the city of Seattle on issues involving his tax dollar. The money is not given to the individual for his/her personal use. A candidate cannot spend it for his/her personal needs or services, but only to promote his/her candidacy, and such activities are closely screened through the Fair Campaign Practices Commission. There is no gift to the individual, but a tremendous benefit to the general public in more representative government by the city council and mayor of their city.

The Seattle ordinance does not violate Const. art. 8, § 7 because (1) the campaign contributions defined by the ordinance are not gifts; (2) the candidate must render substantial consideration to the public to become eligible to receive them; and (3) such contributions are entitlements and constitutionally permissible.

UTTER and DIMMICK, JJ., concur.
STAFFORD and PEARSON, JJ., concur in the result.

WILLIAMS, C.J. (dissenting)—I agree with the first portion of Justice Rosellini's dissent that the issue of the

validity of Seattle's campaign financing ordinances is moot. I also agree with Justice Rosellini that this is not the type of situation, such as that presented by *Roe v. Wade*, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973) or *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 615 P.2d 440 (1980), that involves matters of continuing and substantial public interest which may escape effective appellate review. Although the purposes underlying the campaign financing ordinances are laudable, I believe we should refrain from rendering a wholly advisory opinion in this matter until we have a valid enactment before us that has been briefed and argued by the proper parties in interest, including representative citizens of the City of Seattle. I therefore agree with Justice Rosellini that it is both inappropriate and unwise to reach the merits of this case despite its mootness.

I wish to make it clear, however, that I do not join in Justice Rosellini's discussion on the invalidity of the Seattle campaign financing ordinances on the basis of Const. art. 8, § 7, pertaining to the prohibition on gifts of public funds to private individuals. I would reserve any ruling on the validity of future campaign financing measures until the issue is squarely before this court.

I dissent.

BRACHTENBACH, J., concurs with WILLIAMS, C.J.

ROSELLINI, J. (dissenting)—The majority gratuitously comments on a moot statute. Because I disagree both as to the propriety of reaching the question of this financing statute's validity and with the majority's discussion of its validity, I dissent.

I

A moot case is one which seeks to determine an abstract question which does not rest upon existing facts or rights. *Hansen v. West Coast Wholesale Drug Co.,* 47 Wn.2d 825, 827, 289 P.2d 718 (1955). In federal article 3 courts, mootness is related to the jurisdiction of the court. U.S. Const. art. 3, § 2 has been read to limit the jurisdiction of these

courts to actual cases or controversies. *See Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n.3, 11 L. Ed. 2d 347, 84 S. Ct. 391 (1964). A federal ruling that a case is moot, by denying the presence of a controversy, thus destroys the court's jurisdiction.

The Supreme Court has at times, however, been willing to relax this rigid rule. For instance, in *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), the Court ruled on the merits of the case despite its apparent mootness. There, the Court observed that pregnancy provided a classic conclusion of nonmootness because it could be "'capable of repetition, yet evading review". *Roe,* at 125 (quoting *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 55 L. Ed. 310, 31 S. Ct. 279 (1911)).

Washington courts have not emphasized the jurisdictional aspect of mootness. Instead, the courts have reviewed otherwise moot cases when the matters were of continuing and substantial public interest. *See, e.g., Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 54, 615 P.2d 440 (1980). In *Hartman v. State Game Comm'n,* 85 Wn.2d 176, 177–78, 532 P.2d 614 (1975), we developed the following criteria. In deciding whether to hear such a case, the court looks to the public nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question.

A fourth criterion, the likelihood that the issue will escape review because the facts of the controversy are short–lived, is also evident in our cases. For example, in *Kurtz* we addressed the propriety of a trial court's closure order. The order closed a public courtroom to the public and press during a suppression hearing. At the time the case was decided, the suppression hearing and trial were long over and the transcript unsealed. Given the nature of criminal procedure and the mandate of the speedy trial rule, a controversy relating to closure would almost always have passed by the time an appellate court could review the case. Thus, our decision in *Kurtz* is similar to *Roe v. Wade,*

*supra.* We reached the merits there because the issue was "capable of repetition, yet evading review".

The majority's opinion makes no reference to these traditional tests for mootness. Instead, it takes notice that the mayor plans to resubmit the ordinance for enactment at a later date and then boldly asserts that "[t]he issue of the legality of the money received by some candidates would undoubtedly be tested at that time." Majority opinion, at 237. This conclusion is based on the assumption that merely because the mayor resubmits the proposal, it will be approved by the city council. Neither this assumption nor the subsequent assertion that because it will be passed it will "undoubtedly" be challenged follow from the fact that the mayor will resubmit the ordinance. Any conclusion as to the future of this ordinance is thus highly speculative. Furthermore, even if an ordinance were resubmitted, this court has no way of knowing what form it may take. Subtle changes in the new law might reverse our opinion as to its constitutionality.

Finally, had the majority applied the traditional mootness analysis set out above, the wisdom of holding that this case is moot would be obvious. First, the issue is not of current public interest because the ordinance is no longer in effect. Any interest previously generated by the statute has become academic by virtue of the city council's failure to renew it. Although reenactment of the ordinance may make it the subject of *future* public interest, it cannot support the inference that it is of *current* interest. Second, although a decision on the merits may provide some guidance to public officials, the need for that guidance cannot be shown because the issue is not now being considered. *If* the mayor resubmits the same ordinance and *if* he can secure enough votes, some guidance *may* be needed. Until such time, however, the public officials simply want advice. Also, the issue is not one that is likely to escape review. Unlike pregnancy or closure of suppression hearings, an appeal may be taken under any new statute before it expires. Thus, there is no need to reach the merits now. No judicial efficiency is

guaranteed by the majority's decision to do so, since reaching the merits may not foreclose an additional future appeal under a new ordinance. Unless the subsequent ordinance is identical, a new appeal would have to be taken because a different ordinance presents different constitutional questions. Therefore, I conclude that the majority's decision to reach the merits of this case is both inappropriate and unwise.

## II

Since the majority chooses to address the merits, however, I must do likewise. Here, too, I disagree with my colleagues.

The majority first describes the beneficial effects of the financing statute and concludes that such statutes do not violate the candidates' First Amendment rights. With both of these propositions, I agree. But the majority then attempts to validate this statute's constitutionality under Const. art. 8, § 7 by asserting that the campaign funds are not for the private benefit of the candidate. The majority notes:

> The electoral process belongs to the public and has no counterpart in the private sector. In such a context, the words "gift" and "subsidy" as conceived by the drafters of Const. art. 8, § 7 have no application. Section 13 of ordinance 107772, codified as Seattle Municipal Code 2.04.400–.480, provides that public campaign funds may be used *only for direct campaign purposes.* Such funds never leave the public arena; they never go into the private pockets of the candidate for his own personal purposes. The candidate holds the funds in a fiduciary capacity and can spend only to further the objectives of the ordinance. When the campaign is over, all public funds not spent for those limited purposes must be returned to the City.

(Footnote omitted.) Majority opinion, at 240–41. This argument is logically unsound. The fact that the electoral process is public does not establish that a private individual who seeks public office for his own private fulfillment or goals is acting in the public good. Although the process

itself may be public, the campaign of any one individual is a private matter, as is how the candidate spends the money. The majority's allegation that the funds may be spent "only to further the objectives of the ordinance" is unfounded. Once the candidate agrees to accept the funds, the only restriction contained in the ordinance is that the candidate spend the monies on the campaign. This limitation is minimal. The candidate is free to engage in any legal method of campaigning, many of which, though legal, would run counter to the objectives of the ordinance. For instance, the candidate could use the funds to purchase needed time for spot commercials which alleged that his opponent was hostile to business or that his election would cost the city jobs. The candidate could thus secure the good wishes of business and special interest groups who could independently campaign for the candidate's election, spending—by the way—as much money as they chose for that purpose.[7]

Furthermore, I find the City's attempt to validate this ordinance through a contract analysis equally unpersuasive, because I find that no consideration supports this alleged contract.

The city council here may have believed that it was receiving adequate consideration for its campaign contributions. This cannot, however, control the court's decision whether the consideration was legally sufficient.

From a review of these cases, it will be seen that Const. art. 8, § 7, as it has been interpreted by this court, forbids subsidies to private individuals or entities, even though they are designed to serve a public purpose and are expected to result in benefits to the State or municipality and its people. Where transactions involving the transfer of public money or property are upheld, it is upon a finding that the transferor has received value in property, pecuni-

---

[7]Note that any limitations on the amount such independent groups spent in the campaign would be an unconstitutional infringement on the First Amendment rights of those groups. *See Common Cause v. Schmitt,* 512 F. Supp. 489 (D.D.C. 1980).

ary return, or services.[8]

Does the City receive value for the contributions which it makes, pursuant to ordinance 107772, to the campaigns of candidates for city offices? Obviously, the candidates benefited under this ordinance do not deliver to the City any property or goods for the money received, nor do they render or agree to render any services. It would seem apparent, therefore, that although intended for a laudable public purpose, these campaign subsidies are gifts within the meaning of Const. art. 8, § 7, permitting the giving away of public funds only for the necessary support of the poor and infirm.

The majority ignores the issue of whether consideration exists for these funds by attempting to characterize the program as "an entitlement". The statutes cited by the majority, however, have not been validated on such nebulous grounds as an entitlement theory. The majority cites no authority for this novel theory and the constitutionality of the cited statutes is not now before this court. Several of the provisions, however, could be justified under either the "poor or infirm" exception to Const. art. 8, § 7 or through some contract analysis. For instance, in return for benefits under the crime victims compensation act, the recipient's right to sue the State was abolished. *Haddenham v. State,* 87 Wn.2d 145, 151, 550 P.2d 9 (1976).

The legal right to sue the State is substantial consideration, unlike the conditions which the recipient agrees to under Seattle's ordinance. These conditions might be consideration if any of them involved the giving of value to the

---

[8]The one case which might not appear to fit within this pattern is *State ex rel. Madden v. PUD 1,* 83 Wn.2d 219, 517 P.2d 585 (1973), *cert. denied,* 419 U.S. 808 (1974), where the PUD, having condemned land belonging to Madden and paid the agreed price for it, was ordered to reconvey to the seller a perpetual easement, which was provided for by statute. The validity of the statute was not attacked, but the PUD protested that, in the particular instance, it was required to convey the easement gratuitously. However, we held that the PUD had never acquired the right to refuse the easement, and consequently there was no gift. That holding was peculiar to the circumstances of the case and has no application here.

City. But they do not. Most of the conditions to which the recipient agrees are already imposed by law and apply alike to recipients and nonrecipients. The one to which the City points as constituting a "detriment" to the recipient is the agreement to limit campaign expenditures.

Whether waiving the right to be free of restrictions on the amount a candidate can spend in his campaign constitutes a detriment to the candidate depends, of course, upon the circumstances of the individual candidate. If one does not have available to him resources exceeding the minimum expenditure agreed to, he loses nothing by waiving his right. On the other hand, if a candidate's resources exceed that amount, he may well hesitate to accept the City's proffer of campaign funds in exchange for an agreement to limit spending. But whatever benefit may accrue to the City by reason of the limitations imposed on expenditures by beneficiaries of the subsidy, it is not of sufficient certainty and substance to convert what would otherwise be a gift to the payment of an obligation, either legal or moral.

It is argued that a candidate who accepts the City's offer enters into a binding contract as a result. The Auditor argues that the contract is illusory, but assuming that it does impose certain obligations on the recipient, it is not a contract which affords to the City a return of value for its money. The undertaking is one of gift, conditioned on the performance of certain conditions, which hopefully will benefit the City and its people. That benefit, however, is too remote and speculative to render this case materially different from those in which subsidies to private enterprises which benefit the public have been held invalid. To hold that this possible benefit creates an obligation of the City to make contributions provided in the ordinance would erode the protection of Const. art. 8, § 7.

If the people of the state believe that such a program is desirable and necessary, even though it involves a gift of public funds, the objective can be achieved by constitutional amendment.

In summary, I believe the majority errs by reaching a

moot question concerning an ordinance that has expired. The validity of any future ordinance will depend on its content and limitations. Thus, the majority's decision to reach the merits probably will not forestall future litigation. Reaching the merits as to this ordinance is thus unnecessary and unwise.

As to the merits, I believe the ordinance in question runs afoul of our constitutional prohibition on gifts to private individuals. I therefore dissent.

DOLLIVER, J., concurs with ROSELLINI, J.

