IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Personal Restraint of:<br><br>M.T.M.L.,<br><br>                 Petitioner, | No. 86707-5-I<br><br>consolidated with |
| In the Matter of the Personal Restraint of:<br><br>R.A.,<br><br>                 Petitioner. | No. 86715-6-I<br><br>ORDER GRANTING MOTION FOR RECONSIDERATION IN PART, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

Petitioners M.T.M.L. and R.A. have moved for reconsideration of the published opinion filed on August 25, 2025. Respondent Department of Children, Youth and Families has filed an answer. The panel has considered the motion pursuant to RAP 12.4 and has determined that the motion should be granted in part, that the opinion should be withdrawn, and that a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the Petitioners' motion for reconsideration is granted in part to reflect that M.T.M.L. is back at Green Hill School and to include additional facts regarding the lack of bathroom access; it is further

ORDERED that the published opinion filed on August 25, 2025, is withdrawn; and it is further

ORDERED that a substitute published opinion be filed.

Birk, J.

, ACJ

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of:<br><br>M.T.M.L.,<br><br>                         Petitioner, | No. 86707-5-I<br><br>consolidated with |
| In the Matter of the Personal Restraint of:<br><br>R.A.,<br><br>                         Petitioner. | No. 86715-6-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

SMITH, J. — "It is the policy of this state that all county juvenile detention facilities provide a humane, safe, and rehabilitative environment and that unadjudicated youth remain in the community whenever possible, consistent with public safety and the provisions of chapter 13.40 RCW." RCW 13.40.038(1).

This is a consolidated case for two petitioners, M.T.M.L. and R.A., who initiated personal restraint petitions (PRPs) seeking review by the Court of Appeals. An order allowing expedited review was granted on June 20, 2024. Petitioners were then residents at Green Hill School, a Department of Children, Youth, and Families (DCYF)-operated juvenile facility. Petitioners allege the conditions at Green Hill are in violation of the United States Constitution, the Washington State Constitution, and Washington State law. Petitioners contend the facility is overcrowded, they were commonly locked in their rooms all day,

and they lacked reasonable access to the bathroom.  Petitioners ask to be released into a community facility or, in the alternative, that DCYF remedy the conditions immediately.

Subsequent to filing his PRP, R.A. transferred to a different facility.  DCYF moved to dismiss R.A.'s petition based on mootness.  R.A. opposes this motion.  While R.A.'s petition is moot, we decline to dismiss it because it raises issues of continuing and substantial public interest.  The conditions at Green Hill violate state law, and DCYF must remedy the conditions.

FACTS

Background

Green Hill School is a juvenile rehabilitation facility serving older juvenile offenders and young adults between the ages of 18 and 25.  Green Hill provides academic and recreational activities for its residents.  Between January 2023 and June 2024, the population at Green Hill increased by over 60 percent, from 150 to 240 residents.  As of May 2024, Green Hill had more residents than its funding and staffing provided for and, in addition, was experiencing significant staffing shortages.  In response to the problems associated with increased residents and staff shortages, Green Hill suspended intakes, required staff to provide additional coverage during evenings and weekends, hired private security guards, and modified programming.

M.T.M.L. and R.A.[1] were confined at Green Hill and were housed in the Hawthorn unit. Hawthorn has four wings and accommodates approximately 60 residents per wing. Hawthorn is a general housing unit, which means residents should spend the majority of any day outside of their cells for programming and recreation time. Residents at Green Hill are provided a personalized treatment plan, which typically consists of individual counseling, treatment groups, and academic and vocational education.

In order for Hawthorn to offer full programming, six staff members are needed. If staffing falls below six people, Hawthorn is put on split programming or "Code Seven." Split programming means that while some of the wings within the unit allow residents out of their rooms for programming, the other residents remain secured in their rooms. The units switch after a period of time so the residents who were in their room are allowed out and those who were in programming must return to their rooms. Depending on the number of staff available, this switch may occur once or twice during any given shift. At least four staff members are needed to facilitate split programming.

When less than four staff members are available, Hawthorn is forced into a Code Seven. Code Seven means the entire campus is on an "institution lockdown" and residents are confined to their rooms. Specifically, "lockdown" means residents "who are not involved in an incident are placed on

---

[1] M.T.M.L.'s and R.A.'s personal restraint petitions have been consolidated for this court's consideration.

administrative time[2] for fifteen minutes or longer while staff respond to an event."

Depending on the amount of staff available, a Code Seven can be campus-wide

or unit specific and can last anywhere from one hour to multiple hours.

Hawthorn is a "dry" unit, meaning the cells do not contain a sink or toilet.

When residents are confined to their cell, they must make a verbal request of

staff to use the restroom.  Residents are commonly required to wait to use the

restroom.  This wait time may be exacerbated by residents' behavior.  For

example, during a Code Seven, when only one resident may use the bathroom at

any given time, if a resident refuses to return to their room after going to the

bathroom, it can "cause a three minute trip to the bathroom to turn into a forty-

five minute trip."  This delay has a trickle effect, such that the next person

requesting to use the restroom must wait even longer.  As a precautionary

measure, residents are provided medical grade urine bottles to use when staff

cannot respond in time to a resident's request to use the bathroom.

<u>Petitioners</u>

According to Petitioners, in the six weeks prior to filing their PRPs,[3]

Hawthorn had fewer than 10 days of full programming and were on a split

schedule for all or part of 28 days.  When on a split schedule, Petitioners were

out of their room between one to four hours per day.  During that same six-week

---

[2] "Administrative time" is a term used when a resident is locked in their room for reasons other than their behavior.

[3] Approximately from April 12, 2024 to May 24, 2024.

period, Hawthorn had six Code Sevens, and Petitioners were in their rooms the entire day. On those days, M.T.M.L. was not permitted to shower.

Petitioners commonly had to wait hours to use the restroom and, because of the lengthy wait times, were instructed to use the plastic urinal jugs provided by the facility. M.T.M.L. asserts he once had to urinate into a plastic bag because staff could not get to him in time. M.T.M.L. also reported that two hours after requesting to use the restroom, he was still waiting and had to defecate in a bag. A staff member removed the bag from his cell 45 minutes later. Additionally, M.T.M.L. did not have laundry soap in his unit for several months and he went two weeks without being provided toothpaste.

M.T.M.L. states that because of staffing problems, he did not have a counseling session for two months and, after that, he received only one session in the span of 10 weeks. He contends his mental health suffered because of the conditions at Green Hill and he did not receive adequate treatment.

DCYF

DCYF admits to staffing shortages and, as a result, modified programming. Between May 28 and June 25, 2024, only 6 of the 35 shifts with complete information had enough staff to run full programming.[4] DCYF also recognizes "there may have been some instances where staff did not transport youth hourly to the bathroom or took longer than one hour to take a youth to the bathroom." DCYF admits providing residents with medical grade urine bottles is

---

[4] Of the 220 shifts with some data, full programming was run 53 percent of the time.

standard practice as a "precautionary measure." DCYF does not explicitly concede residents are not given access to daily showers but says, "Residents are typically given an opportunity to shower daily." In addition to staffing issues, DCYF points to a "marked increase" in unsafe incidents, including assaults among residents, to explain the increase in spilt programming and Code Sevens. Additionally, DCYF highlights several incidents M.T.M.L. and R.A. were involved in that disrupted programming and resulted in a "more volatile facility."

While it admits to staff shortages and modified programming, DCYF denies the extent to which these modifications affected Petitioners. DCYF notes staff "found no evidence of residents being locked in their rooms for 22 hours at a time." DCYF staff reviewed nine randomly selected surveillance videos between April 1, 2024 and May 23, 2024 covering the graveyard shift in the Hawthorn unit.[5] The footage reviewed included M.T.M.L.'s and R.A.'s doors. Six resident indicator lights were turned on during this time. Of those six, staff responded to five within 15 minutes and the sixth one within 61 minutes.

DCYF states that during split programming or a Code Seven, residents remain in their room only as long as necessary to resolve the issue or behaviors that caused the disruption. However, if the Code Seven is because of staffing shortages, the duration is contingent on safe staffing levels. Code Sevens occur about once a week, typically on Sundays. DCYF maintains room isolation is not used as punishment.

---

[5] The graveyard shift is from 11:00 p.m. to 6:00 a.m.

With regard to M.T.M.L.'s mental health treatment, DCYF notes M.T.M.L. received an individualized treatment plan, met with a psychiatrist seven times in 2024, and had six sessions with a counselor. DCYF also notes that M.T.M.L. did not request additional services until May 2024 and then declined to engage when staff responded to the request in June 2024.

Personal Restraint Petitions

Petitioners initiated PRPs, alleging Green Hill's conditions of confinement violate their due process rights and state law. The ACLU of Washington Foundation, Columbia Legal Services, and TeamChild moved to submit an amicus curiae in support of Petitioners' PRPs.

After submitting his PRP, R.A. requested to be transferred from DCYF custody to Department of Corrections (DOC). The board granted R.A.'s request to transfer. On February 25, 2025, DCYF filed a supplemental appendix indicating that M.T.M.L. was transferred to Oakridge Community Facility in January 2025. Oakridge is a group care facility operated for the care of youth committed to DCYF's custody. On or around March 25, 2025, M.T.M.L. escaped from Oakridge.

We heard oral arguments in this case on May 29, 2025, and issued an opinion on August 25, 2025. On September 15, 2025, M.T.M.L. and R.A. moved for reconsideration, contending our opinion omitted a critical fact[6] and M.T.M.L.'s PRP is no longer moot because he had returned to Green Hill prior to the

---

[6] The critical fact was that M.T.M.L. filed a complaint with Green Hill in July 2024 because he had to defecate in his cell after requesting to use the restroom and not receiving access for an hour.

issuance of our opinion.  DCYF agrees M.T.M.L.'s petition is no longer moot and we should address the issues.

## AMICUS CURIAE

Under RAP 10.6(a), "[t]he appellate court may on motion grant permission to file an amicus curiae brief only if all parties consent, or if the filing of the brief would assist the appellate court."

Here, the ACLU of Washington Foundation, Columbia Legal Services and TeamChild moved to file an amicus curiae memorandum in early February 2024 and suggested DCYF could have additional time to respond to avoid any prejudice caused by the untimeliness of the motion.  DCYF did not agree to the late filing.  Given the untimeliness of the request, the fact that the matter before us is in a PRP, and the briefing does not provide much, if any, new information not already provided by Petitioners, we deny the motion.

## MOTION TO DISMISS

DCYF contends R.A.'s PRP is moot because this court can no longer provide him effective relief.  R.A. claims the court can still grant him relief because he could be returned to Green Hill and, even if his PRP is moot, it falls under an exception to mootness.  We agree R.A.'s PRP is moot; however, we deny DCYF's motions to dismiss because R.A.'s PRP raises issues of continuing and substantial public interest.

Generally, this court will not review a petition when the issue is moot.  *In re Det. of M.K.*, 168 Wn. App. 621, 625, 279 P.3d 897 (2012).  An issue is moot when "this court can no longer provide effective relief."  *M.K.*, 168 Wn. App.

at 625.  But, even when a petition is moot, this court may accept review if the petition presents an issue of continuing and substantial public interest.  *In re Marriage of Horner*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004).  To determine whether an issue is of continuing and substantial public interest, the court considers three factors: " '(1) whether the issue is of a public or private nature; (2) whether an authoritative determination is desirable to provide future guidance to public officers; and (3) whether the issue is likely to recur.' "  *Horner*, 151 Wn.2d at 892 (internal quotation marks omitted) (quoting *Westerman v. Cary*, 125 Wn.2d 277, 286-87, 892 P.2d 1067 (1994)).

Here, R.A. contends his petition is not moot because the court can provide effective relief.  To provide R.A. effective relief, he would need to be transferred back to Green Hill.  R.A. is correct that under RCW 13.40.230(6), he could potentially be transferred back to Green Hill, but that is at the discretion of DCYF and DOC.  Unless and until R.A. is transferred back to Green Hill, his petition is moot because this court cannot provide him effective relief.

<u>Continuing and Substantial Public Importance</u>

The conditions at Green Hill have received considerable news coverage recently,[7] and Green Hill's efforts to address overcrowding was the subject of a recent lawsuit.  In July 2024, Green Hill transferred 43 adult-convicted individuals

---

[7]  *See e.g.*, Lauren Girgis, <u>Head of WA Juvenile Detention Talks about the Troubled System</u>, SEATTLE TIMES (Aug. 17, 2024), https://www.seattletimes.com/seattle-news/law-justice/head-of-wa-juvenile-detention-talks-about-the-troubled-system/ [https://perma.cc/P5C2-GB3W]; Ross Hunter, <u>No Good Answers: Why I Moved 43 Men from Youth Lockup to Prison</u>, SEATTLE TIMES (Aug. 2, 2024), https://www.seattletimes.com/opinion/no-good-answers-why-i-moved-43-men-from-youth-lockup-to-prison/ [https://perma.cc/9TJA-XPVX].

from Green Hill to DOC. The individuals challenged this action, and in response, the court issued an injunction and ordered the individuals back to Green Hill, noting the transfer violated state law. In spite of DCYF's efforts to combat overcrowding and understaffing, Green Hill's population remains over capacity and staffing continues to be a challenge.

We recognize, as Felice Upton, assistant secretary of juvenile rehabilitation for DCYF, stated in her declaration dated July 13, 2024, "Green Hill School's mission is to provide a safe, structured, and secure environment where residents can learn new skills, develop positive habits, and disengage from activities that brought them to Green Hill." The conditions at Green Hill raise an issue of a public nature and concern, and are likely to recur without further guidance. For these reasons, and because we will be addressing similar issues regarding M.T.M.L, we deny DCYF's motions to dismiss and accept review of R.A.'s petition as well under the exception to mootness.

ANALYSIS

Standard of Review

This court will grant appropriate relief to a petitioner who is under "restraint" where the restraint is unlawful. RAP 16.4(a). A petitioner is under restraint if they are confined because of a court decision in a civil or criminal proceeding. RAP 16.4(b). Restraint is unlawful when "[t]he conditions or manner of the restraint of petitioner are in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(6).

10

A petitioner initiating a PRP bears the burden of providing the facts on which the claim rests and evidence sufficient to support those factual allegations. RAP 16.7(a)(2). This requires that the petition state with particularity facts that, if proved, would entitle the petitioner to relief. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Bald assertions and conclusory allegations are not sufficient. *Rice*, 118 Wn.2d at 886.

To obtain relief from a personal restraint petition based on a constitutional error, the petitioner must show "(1) a constitutional error occurred and (2) the error resulted in actual and substantial prejudice." *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 353, 496 P.3d 289 (2021). But where a petitioner raises claims "for which there was 'no previous opportunity for judicial review,' " the petitioner is not required to make a threshold showing of prejudice. *Williams*, 198 Wn.2d at 353 (quoting *In re Pers. Restraint of Gentry*, 170 Wn.2d 711, 714, 245 P.3d 766 (2010)).

### Article I, Section 14 of the Washington State Constitution

Petitioners claim their confinements violated the Washington State Constitution's ban on cruel punishment. DCYF contends Petitioners' restraints were reasonably related to a legitimate government objective and, therefore, constitutional. We agree with DCYF that the Petitioners' confinements did not violate either the Washington State Constitution or United State Constitution, but for reasons other than those DCYF asserts.

Article I, section 14 of the Washington State Constitution prohibits cruel punishment, including for conditions of confinement. *See, e.g., Williams*, 198

Wn.2d at 353. The Washington State Constitution is "more protective of the health and safety of prisoners than its federal counterpart." *Id.* at 363. The State has a nondelegable duty to provide for the health, safety, and well-being of its prisoners, and a finding of unsuitable conditions of confinement "does not depend on the subjective knowledge or intent of particular prison officials." *Id.* at 366.

Under the Washington State Constitution, cruel conditions of confinement can arise from intentional acts by prison officials or institutional policies and practices. *Williams,* 198 Wn.2d at 365. "Washington prisons may not cause 'the deprivation of human dignity by conditions primarily related to sanitation and hygiene which are so base, inhumane and barbaric they offend the dignity of any human being,' " whether intentionally or accidently. *Id.* at 361 (quoting *Woods v. Burton*, 8 Wn. App. 13, 16-17, 503 P.2d 1079 (1972)).

To prevail on a PRP challenging conditions of confinement, the petitioner must show "(1) those conditions create an objectively significant risk of serious harm or otherwise deprive the petitioner of the basic necessities of human dignity and (2) those conditions are not reasonably necessary to accomplish any legitimate penological goal." *Williams*, 198 Wn.2d at 363. When a petitioner claims the conditions of their confinement violate both state and federal constitutions, where feasible, this court will resolve the question under our own state constitution before turning to federal law. *Id.* at 353.

Harsh conditions of confinement "may sometimes be justified by legitimate penological interests, including the health and safety of the prison population as

12

a whole." *Williams*, 198 Wn.2d at 367.  To withstand constitutional scrutiny, the condition must be "reasonably necessary" to further a legitimate penological goal. *Id.* at 367.

Penological goals of the juvenile justice system include retribution, deterrence, incapacitation, and rehabilitation.  *State v. Moretti*, 193 Wn.2d 809, 826, 446 P.3d 609 (2019).  Whereas the criminal justice system is punitive in nature, the purpose of Washington's juvenile justice system is rehabilitative. *State v. J.H.*, 96 Wn. App. 167, 172, 978 P.2d 1121 (1999).  Some objectives of juvenile justice are "[m]ak[ing] the juvenile offender accountable for his or her criminal behavior; . . . [p]rovid[ing] for the rehabilitation and reintegration of juvenile offenders; . . . [and p]rovid[ing] necessary treatment, supervision, and custody for juvenile offenders."  RCW 13.40.010(2).

1.  Deprivation of Human Dignity

Petitioners claim their conditions of confinement, specifically, being confined to their rooms for extended periods of time, deprived of timely access to the restroom, and forced to relieve themselves in their cells, deprived them of "basic necessities of human dignity."[8]  *Williams*, 198 Wn.2d at 363.  Petitioners rely primarily on *Williams* to support their claim.

In *Williams*, Robert Rufus Williams, a 78-year-old incarcerated individual, challenged his conditions of confinement.  198 Wn.2d at 346.  Williams used a

---

[8]  M.T.M.L. also contends he is not receiving adequate treatment as due process requires, but provides no argument for why the services he is receiving fall below the acceptable standard of care.  Accordingly, we decline to reach this issue.

wheelchair and relied on therapy aides to assist him with daily tasks, including going to the restroom. *Id.* at 350. Williams was housed in a dry cell with three other individuals and often waited long periods of time for assistance. *Id.* As a result, he was forced to relieve himself into a bottle in his room and frequently soiled himself. *Id.* The Washington State Supreme Court found these conditions to be "objectively cruel." *Id.* at 369. The court stated, "[T]he conditions of Williams' confinement exposed him to a significant risk of serious harm by depriving him basic hygienic necessities." *Id.* at 369. The court concluded these conditions were not "reasonably necessary to accomplish a legitimate penological goal" and, accordingly, held the conditions of Williams' confinement to be unconstitutionally cruel. *Id.* at 370.

Petitioners contend their circumstances were similar to *Williams* and, therefore, their constitutional rights were violated. DCYF asserts *Williams* is not analogous because Williams was 78 years old, suffered from multiple ailments, and was completely dependent on aides to assist him with daily tasks. DCYF claims the court in *Williams* found objectionably cruel conditions only in light of Williams' disabilities: Williams was unable to care for himself or keep himself clean, whereas Petitioners were not exposed to a significant risk of harm.

While the conditions Petitioners were experiencing do raise serious concerns about the treatment of juveniles in custody, they do not rise to the level of a constitutional violation. As DCYF correctly points out, the conditions here are not analogous to *Williams*. First, the *Williams* case arose during the height of the COVID-19 pandemic, and Williams specifically argued "his confinement

14

during the COVID-19 pandemic was cruel." 198 Wn.2d at 351. While the pandemic did not explicitly guide the court's holding, it was a factor the court considered when acknowledging the challenges faced by prison administrators. *Id.* at 369.

Williams also suffered from ailments that exasperated his conditions of confinement. Williams was 78 years old and had minimal use of one side of his body. *Id.* at 350. He required assistance to use the restroom, and when wait times were too long, he frequently soiled himself, resulting in "severely unhygienic conditions." *Id.* at 369. The court noted it was "in light of [Williams'] physical disabilities" that his conditions of confinement exposed him to "a significant risk of serious harm." *Id.*

Indisputably, it was improper that Petitioners were sometimes forced to urinate in plastic containers, and M.T.M.L. once had to defecate in a bag, because bathroom wait times were too long. But the unhygienic conditions did not expose them to a serious risk of harm like that faced by Williams. Neither Petitioner suffered from a disability that required assistance when using the restroom, and neither petitioner soiled themselves. The conditions of Petitioners' confinement, while certainly unacceptable and requiring immediate resolution, were not so inhumane or barbaric that they offend human dignity.

Because Petitioners' conditions of confinement did not deprive them of the basic necessitates of human dignity, we conclude the conditions were not unconstitutional.

2. Penological Interests

Even though we find no constitutional violation, we address DCYF's argument that Petitioners' conditions of confinement were reasonably related to a legitimate government interest. DCYF claims that, even if the conditions of confinement deprived Petitioners of human dignity, they were still constitutional because they were reasonably related to the legitimate government interest of safety, order, and security. DCYF cites *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct 1861, 60 L. Ed. 2d 447 (1979), in asserting juvenile facilities are given wide-ranging deference "in the adoption and execution of policies and practices that in their judgement are needed to preserve internal order and discipline and to maintain institutional security." While DCYF is correct that institutional safety and security are legitimate penological interests and, sometimes, harsh conditions are warranted to further these interests, overcrowding cannot be allowed to continue unchecked, creating the exact harsh conditions that are then labeled a legitimate interest.

DCYF admits overpopulation and staffing challenges contribute to an increase in modified programming, which results in residents being confined to their room for large portions of the day. DCYF also admits "[h]igher population levels and double-capacity rooms increase incidences of violence amongst residents. It also increases both residents' and staff's fear for safety, which compounds issues regarding violence and staff turnover." DCYF cannot implement policies limiting the residents' access to programming and claim it is because of safety and security concerns when it is DCYF's own inability to

resolve the issues of overpopulation and understaffing that gave rise to those concerns. The longer this continues, the less it becomes a legitimate government interest and the more it becomes a constitutional concern.

<u>Fourteenth Amendment Due Process Clause</u>

The due process clause of the Fourteenth Amendment governs the conditions in which juveniles may be confined. *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987). Due process guarantees the "right to reasonable safety and freedom from physical restraint," *Youngberg v. Romeo ex rel. Romeo*, 457 U.S. 307, 319, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982), as well as the right to adequate treatment. *State v. S.H.*, 75 Wn. App. 1, 19, 877 P.2d 205 (1994), *abrogated on other grounds by State v. Sledge*, 83 Wn. App. 639, 922 P.2d 832 (1996). Furthermore, the nature and duration of a juvenile's commitment must " 'bear some reasonable relation to the purpose for which the individual is committed.' " *S.H.*, 75 Wn. App. at 19 (quoting *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972)). A juvenile detainee's due process rights are violated if a particular condition is not reasonably related to a legitimate government objective, such that it is "arbitrary or purposeless." *Bell*, 441 U.S. at 539.

For the same reasons we find Petitioners' rights were not violated under the Washington State Constitution, Petitioners' rights were also not violated under the United States Constitution.

17

Washington State Law

Petitioners contend the conditions of their confinement violated Washington State law because they were restricted to their rooms for extended periods of time and not provided adequate care or supervision. DCYF admits Petitioners did not receive the care or supervision required by law, but contends it has taken steps to address the issue. DCYF admits it violated state law.[9] DCYF must remedy the conditions at Green Hill immediately.

Under RCW 13.22.010, "room confinement" means "a juvenile is separated from the youth population and placed in a room or cell that the juvenile is assigned to for sleeping, other than during normal sleeping hours or interim rest hours." Room confinement may be utilized "when it is necessary to prevent behavior that causes disruption of the detention facility or institution, but the behavior does not rise to the level of imminent harm including, but not limited to, behavior that may constitute a violation of law." RCW 13.22.020(2)(g). The use of room confinement should be as minimal as necessary, while still protecting "the safety and security" of juveniles and staff. RCW 13.22.030(1)(b). Room confinement must be limited to "no more than four hours in any twenty four hour period," unless specific requirements are met. RCW 13.22.020(2)(a)(i). If placed in room confinement, the juvenile must be checked on at least every 15 minutes, have access to a toilet and sink at least hourly, and have access to a bath or shower daily. RCW 13.22.020(2)(b).

_____

[9] At oral argument on May 29, 2025, DCYF admitted it had not provided Petitioners with the level of care required by law.

Here, DCYF does not deny Petitioners' claims that they were subjected to room confinement beyond what is allowed by statute. DCYF admits, "There has been an overall increase in Code Sevens and modified programming within Hawthorn and Willow Units over the past several months. Overpopulation, increasing violence among the residents, and staffing shortages have all contributed to this increase." DCYF acknowledges there may be times that residents do not have the opportunity to shower daily and also admits on "at least one occasion a resident had to wait for approximately one hour" to use the restroom.

DCYF claims it has taken substantial steps to improve the conditions at Green Hill, but those efforts do not excuse it from the failure to comply with RCW 13.22.020. Even though room isolation is not used as a punishment, it is still being used as a means to address overpopulation and understaffing and in a way unauthorized by Washington State law. Juveniles in room confinement, including Petitioners, must have hourly access to the restroom and daily access to a shower, and be in room confinement no more than 4 hours in any 24-hour period, unless specific requirements are met. Petitioners have shown by a preponderance of the evidence that DCYF did not meet these conditions; therefore, the conditions of Petitioners' confinement violated state law.

### Relief

Petitioners request relief in the form of immediate release or an order for DCYF to remedy the conditions. Immediate release is not an appropriate remedy here, but DCYF must rectify the conditions at Green Hill that violate state law.

19

In some circumstances, conditions of confinement can be so punitive as to require immediate release. *See In re Det. of Campbell*, 139 Wn.2d 341, 349-50, 986 P.2d 771 (1999). But generally, "challenges to conditions of confinement under article I, section 14 of Washington's constitution . . . arise as PRPs, seeking injunctive relief ordering prisons to remedy any unconstitutional conditions." *Williams*, 198 Wn.2d at 366. But this court "will only grant relief by a personal restraint petition if other remedies which may be available to petitioner are inadequate under the circumstances." RAP 16.4(d).

Because Petitioners' constitutional rights were not violated, they should not be granted relief in the form of immediate release. But the conditions at Green Hill, by DCYF's own admission, do violate state law, and DCYF must remedy the conditions and comply with state law.

In sum, we grant Petitioners' PRPs in part as to the violation of state law but deny as to the constitutional violations.

_____

WE CONCUR:

_____          _____, ACJ